JAMES MORRELL v. CITY OF AUSTIN AND ANOTHER.[1]

June 28, 1940.

No. 32,408.

[1]Reported in 293 N. W. 144.

*Sasse, French & Dunnette,* for relator.
*J. Frank Boyles,* for respondents.

JULIUS J. OLSON, JUSTICE.
*Certiorari* to the industrial commission to review an order denying recovery for medical and surgical expenses incurred by the employe.

While employed by the city of Austin on January 26, 1935, relator suffered a very serious accident with resulting painful and lasting injuries all arising out of and in the course of his employment. He was taken to a hospital and placed under the care of Dr. Hertel, a physician selected by the employer and its insurer. While still under such care he was also examined by Dr. Nelson, of Minneapolis, also selected by the employer and its insurer. On September 21, Dr. Nelson reported the result of his examination to insurer, stating that he was of the view that relator's remaining difficulties were due to congenital abnormalities, not caused by or associated with the accident. But relator continued to suffer, being confined to bed the greater part of the time, was not under the care of any physician for a time, but was receiving nursing care. On March 23, 1936, with the aid of one Mr. Elliott of Austin, he wrote a letter to the "Industrial Commission of Minnesota" at its office in St. Paul. Therein he said he had not regained his strength; that he was suffering pain; and that he felt he should go to Rochester, there to be examined by the Mayo Clinic "with the idea of finding out what may be retarding my betterment. * * * In the event it becomes necessary for me to go through the clinic at Roches-

ter what precaution or form shall I fill out or have filled out to protect me so that at some future date I can collect for medical attention?" The letter was answered by one Hansen, compensation attorney for the commission, on April 1, 1936. Therein, amongst other things, relator was told that he should communicate with the compensation insurer and obtain its authorization and consent to further medical treatment "so as not to give rise to a dispute later on. The reason I say this is because *the employer and insurer* under compensation *have the exclusive right to appoint the attending physician,* and if you obtain medical attention and incur medical expense, therefore [therefor] you are personally liable." (Italics supplied.)

On April 6, relator, Mr. Elliott again doing the writing, wrote Mr. Hudgins, "Manager Claim Division" of the insurer. The information therein contained is to the effect that he was still suffering "unlimited pain" in his chest and back and that he had noticed very little, if any, improvement. "I feel that it would be to your advantage as well as my own, if I could go thru the Mayo Clinic at Rochester, and see if some relief and improvement could not be obtained," also suggesting that he be advised "immediately which of the Rochester Doctors you would want to have examine me." Relator was invited to come to Minneapolis and, pursuant thereto, submitted to an examination by Dr. Nelson and Dr. Hultkrans on April 21, 1936. He testified that he again informed Mr. Hudgins that he wanted to go to Rochester, but was told that this was an expensive place and that if he went there it would be at his own expense. On May 15, Mr. Hudgins wrote relator, saying: "We should appreciate your writing us promptly as to when you think you will have arranged your affairs at Austin so that you may be able to submit to the operation at Minneapolis, which will be performed by Dr. Nelson and Dr. Hultkrans." He was requested to promptly notify the writer as to when he expected to reach Minneapolis so that arrangements might be

made for the operation, which had been arranged for on April 21. On May 26, Mr. Elliott's services again being called into play, Mr. Hudgins was notified of relator's decision to go to the Mayo Clinic. On the same day Mr. Hudgins wrote that:

"We are in no position to compel you to submit to the operation by the doctors of our own choice; however, we do have something to say about the expense incidental thereto. As we explained to Mr. Elliott, who has doubtless informed you of our attitude, we are satisfied that our Minneapolis doctors are entirely competent to perform the operation and do anything and everything necessary to restore your health. * * * *If the offer is not accepted and you elect to go to the Mayo Clinic, we shall be compelled to decline to assume any responsibility whatsoever for any expense incurred there or elsewhere.*" (Italics supplied.)

At relator's request, Mr. Elliott took him to the Mayo Clinic, where on May 29 an operation was performed to cure relator's hernia, described by the doctor who performed the operation as "a very bad hernia." There relator was kept many weeks. Because the shock of another needed operation prevented its then performance, relator returned to the clinic in April, 1937. This, too, was a difficult surgical matter, involving as it did a "lumbosacral fusion" of the spine. The result of this operation was "an excellent, solid fusion and support as shown in the X-ray, and I would anticipate he would have at least a satisfactory result."

The referee found that relator sought and received treatment at the Mayo Clinic and paid therefor $509.86, and an additional amount of $7.50 paid at St. Mary's Hospital. In addition, he is indebted to the clinic for $1,433.50. "That said hospital, surgical and medical care were given to cure and relieve conditions caused by the accidental injury arising out of and in the course of said employment on January 26, 1935." The only reason assigned for disallowing

these items was that in going to Rochester and receiving his treatments there he had made "his own selection and failed to secure the permission of the employer or the insurer herein so to do or to secure from the industrial commission * * * an order for change of physicians." On appeal to the commission the referee was sustained.

Of importance too are the following facts: On December 30, 1935, the insurance carrier filed with the commission a notice of proposed discontinuance of compensation payments, claiming that "the right to discontinue such payment is based upon the following facts, viz: See attached memo." The memorandum thus referred to reads:

```
"Employe has made settlement of 3rd
 party cause of action for the sum of............$4,500.00
 "Expenses:
"Attorney's fees ....................$1,500.00
"[Sundry items of expense........... 174.65]
"Medical expense paid by Maryland Cas-
 ualty Company .................... 482.88
"Compensation paid by Maryland Cas-
 ualty Company ................... 846.00 $3,003.53
 _____
"Balance to James Morrell ........... $1,496.47"
```

The commission gave due notice to the employe thereof. The matter was not so disposed of, however. Then, on September 7, 1938, a further notice of proposed discontinuance of compensation payments was filed by the insurer wherein it was claimed: "Claimant is able to work and has been for some time." Again notice was given relator. On September 22, Mr. Hansen, as compensation attorney, gave notice that a hearing on the proposed discontinuance was wanted. Such hearing was duly ordered to be had on October 28, and a referee appointed "to determine the rights of the respective parties." At this hearing the entire matter

was fully gone into and affords the basis for the facts recited.

From what has been stated it is obvious that the issue is a very narrow one. There is no question about relator's serious injury arising out of and in the course of his employment; nor can there be in respect of his need of prompt and efficient medical and hospital care to the end that he might be restored to health and useful service to society instead of being left a hopeless physical derelict. There is no issue about the fairness and reasonableness of the charges made by the doctors and hospitals at Rochester in providing and furnishing the medical and hospital aid reasonably required to heal and cure him. Only in the sense that the employer and its surety failed to consent to a change of physicians and the commission's failure to heed relator's request for such change is found the basis for the denial of reimbursement.

It will be noted that over a period of more than 16 months the employer and its insurer and the physicians by them employed had fumbled and delayed the discovery of relator's real needs and requirements and had failed to furnish the professional aid really owed to relator. This is not a case where professional incompetency has come into play on relator's part as a consequence of which additional burdens have been imposed upon respondents. Quite the contrary is obvious.

■ The statute upon which the respondents and the commission rely is 1 Mason Minn. St. 1927, § 4279. Under its provisions—

The employer "shall furnish such medical, surgical and hospital treatment, including nursing, medicines, medical and surgical supplies, crutches and apparatus, including artificial members, as may reasonably be required at the time of the injury, and during the disability * * * to cure and relieve from the effects of the injury, *provided that in case of his inability or refusal seasonably to do so, the employer*

*shall be liable for the reasonable expense incurred by or on behalf of the employe in providing the same; * * ***

"*The Commission may at any time* upon the request of an employe or employer *order a change of physicians and designate a physician suggested by the injured employe* or by the Commission itself *and in such case the expense thereof shall be borne by the employer* * * *."* (Italics supplied.)

We think the recited facts unmistakably disclose that the employer's and its insurer's treatment of relator's said plight amounts to the statutory equivalent of "inability or refusal *seasonably*" to furnish and provide that which the statute requires.

Undoubtedly by this section the commission is invested with authority "to order a change of physicians," but in designating such other it must heed the further requirement of selecting "a physician suggested by the *injured employe*" or it must make its own choice. While either employer or employe may "request" such change, only the employe or "the Commission itself" may "designate" such physician.

Nor does the record sustain the view that the commission "refused" relator's request for such change. What was done, as already pointed out, was that relator was told to communicate with the insurer and obtain its consent "so as not to give rise to a dispute later on," giving as a reason the erroneous advice that employer and insurer "*have the exclusive right* to appoint the attending physician." In other words, the commission washed its hands of the whole affair and never exercised its granted authority. Its attorney told relator what he should do, and he did just as he was told. Respondents were adamant in their erroneous claim that if he did not accept their chosen physicians to perform the needed operations they would be "compelled to decline [or] to assume any responsibility whatsoever for any expense incurred."

Relator is an ordinary working man wholly uninformed as to procedural requirements. He was without aid of coun-

sel. His position is easily visualized. Suffering as he was with pains and disabilities caused by an industrial and compensable accident, he was left in a state of complete ignorance as to the true legal course to pursue to get needed professional aid. He indicated his choice of medical service in language that no one could misunderstand. His own rehabilitation was uppermost in his mind. The wisdom of that choice is apparent from the results obtained. It seems clear that applying the same theory and the same process of reasoning as were adopted and applied in the recent case of Carmody v. City of St. Paul, 207 Minn. 419, 291 N. W. 895, there can be no escape from the conclusion that relator is entitled to reimbursement for the expenses paid and incurred. True, in that case the question determined was not the employe's right to change the physician; but, as to his *right* to make the initial choice, that decision supports him. It may well be that if the employer and the insurer had correctly informed him of his rights and if he had then ignored them a different result might now be compelled.

No suggestion has been made that if the doctors employed by the insurance carrier had rendered the service here provided the charges for such service would be any less than those made by the justly famous Mayo Clinic. By virtue of their services the objectives and beneficent purposes of the compensation law have been belatedly obtained.

We are neither limiting nor extending the plain purpose of § 4279. For, as well voiced in the specially concurring opinion in the Carmody case (207 Minn. 428, 291 N. W. 899):

"There is much to be said in favor of permitting an employe who is injured to select his family physician or some other physician of his choice. There is also much to be said in favor of giving to the employer, who is required to pay the bills, a voice in the selection of the physician."

Respondents' liability here is predicated not upon their *right* to "a voice in the selection of the physician" but rather

and only because they erroneously and arbitrarily insisted upon *the exclusive right* to make such appointment. And the commission having advanced that view as the only applicable one and made it the basis for its failure to make such change as was wanted by relator or to make its own choice, there being no doubt about the need of the services rendered and the charges being reasonable, we can see no escape from holding that liability has attached and should be made good by respondents.

Order reversed and the commission instructed to allow relator reimbursement in accordance with the views heretofore expressed. Relator will also recover $100 attorneys' fees in this court plus his taxable costs and disbursements.

So ordered.

STONE, JUSTICE (dissenting).

As matter of ethics, this decision is plainly right. But, feeling that it is governed by statute, under which decision should arbitrarily go the other way, I must state my reasons for that conclusion.

Our recent decision in Carmody v. City of St. Paul, 207 Minn. 419, 291 N. W. 895, did not settle the issue. That was a case where the employe, immediately upon injury and disability, insisted upon treatment by a physician of his own selection. We held that to be his right under the statute. 3 Mason Minn. St. 1940 Supp. § 4279.

The history of the statute and its evolution through amendment into its present form was reviewed. The decision was only that an injured employe had the right under the compensation law to make the initial selection of physician or surgeon. We had no occasion to consider whether, the treatment having been commenced and for some time continued by a physician selected by either employe or employer, there could be a change with resulting right to charge the employer or his insurer with the additional expense. That is the question presented now. I think it is answered by the following language of the statute (§ 4279):

"The commission may at any time upon the request of an employe or employer order a change of physicians and designate a physician suggested by the injured employe or by the commission itself, and in such case the expense thereof shall be borne by the employer * * * ."

That declaration should settle this case against relator. The purpose was, while giving the employe the right to make the initial selection, to keep charges thereafter incurred within the control of the commission, with some right of veto over a selection made by either employe or employer. Equally it is the intention to give each of them the right to urge "a change of physicians" and secure it if the commission approves. So the statutory prerequisite to the present demand of relator, that "in such case the expense thereof shall be borne by the employer," is absent.

There is good reason for the legislative purpose to give the commission much control over the selection and payment of physicians and surgeons chosen to treat injured employes. The decision of the commission in the Carmody case was accompanied by a memorandum by Commissioner Williams in which he tabulated the medical expenses in 1,144 "closed cases." He says that medical costs have exceeded the figures given below for each group:

| | | |
|---|---|---|
| 950 cases | .............. | $ 1,000 |
| 114 " | .............. | 2,000 |
| 44 " | .............. | 3,000 |
| 15 " | .............. | 4,000 |
| 3 " | .............. | 5,000 |
| 5 " | .............. | 6,000 |
| 2 " | .............. | 7,000 |
| 1 case | .............. | 9,000 |
| 1 " | .............. | 11,000 |
| 2 cases | .............. | 12,000 |
| 1 case | .............. | 14,000 |
| 1 " | .............. | 15,000 |

| | | |
|---|---|---|
| 1 | " | 16,000 |
| 1 | " | 19,000 |
| 1 | " | 23,000 |
| 1 | " | 34,000 |
| 1 | " | 35,000 |

Mr. Williams mentions an additional "open case" wherein the medical expense to October 1, 1939, exceeded $73,000. Under the compensation law, employers as well as employes have rights, and both are afforded protection. The figures gathered by Commissioner Williams show how much and how constant is the need for supervision by the commission of medical expenses incurred by injured employes, and serve both to emphasize and justify the express legislative purpose to make a change of physicians subject to the approval of the commission.

Our review of decisions of the industrial commission does not include the right of trial anew. We have no visitorial power, and it is not our function to correct errors in the making or failure to make administrative orders. Whether the statute is right or wrong, our duty is one of obedience. Our duty of interpreting and applying statutes should not be so used as to trespass upon the legislative field. It seems to me that this decision amounts to such invasion of a domain which is not ours. Whether we like the statute or not, it should be obeyed. If it does not work properly, it is for the legislature to make the necessary changes.

GALLAGHER, CHIEF JUSTICE (dissenting).

I agree with the views expressed by Mr. Justice Stone.

MR. JUSTICE LORING took no part in the consideration or decision of this case.