(No. 6804 October 31, 1941)

ELDON FLOCK, Respondent, v. J. C. PALUMBO FRUIT COMPANY, Employer, and STATE INSURANCE FUND, Surety, Cross-Appellants, and I. R. WOODWARD, Appellant.

(118 Pac. (2d) 707)

George Donart and E. B. Smith, for Appellant.

Norris & Kenward, for Cross-Appellant, J. C. Palumbo Fruit Company.

Clarence L. Hillman, for Cross-Appellant, State Insurance Fund.

Freehafer & McClure, for Respondent.

GIVENS, J.—Respondent Flock, while employed by J. C. Palumbo Fruit Company, respondent and cross-appellant, engaged in processing, packing, and shipping fruit near New Plymouth, suffered, on June 2, 1939, a compensable industrial accident by falling from an apple tree, alighting astride a limb, injuring his left testicle. Dr. I. R. Woodward of Payette was the employer's contract physician,[1] with whom was associated his brother,

---

[1]"Hospital Contract

This Contract and Agreement, Made and entered into this 21 day of August, 1937, by and between Dr. I. R. Woodward, a qualified physician and surgeon, licensed to practice in the State of Idaho, and doing business under the firm name of I. R. Woodward Hospital, located at Payette, Payette County, Idaho, party of the first part, and J. C. Palumbo Company, a ................., .................... successors or assigns, party of the second part, Witnesseth:

Whereas, the party of the first part is conducting the I. R. Woodward Hospital at Payette, Idaho, and has arrangements with Specialists in Diseases of the Eye, Ear, Nose and Throat in Boise, Idaho, for the Medical, Surgical and Hospital care of sick and injured persons, and

Whereas, the party of the second part is engaged within the State of Idaho, in Fruit Packing & Canning, and other work in connection therewith and pertaining thereto; and in such business aforesaid, the party of the second part has a number of employes in its employ in carrying on said business, and

Whereas, it is deemed desirable by the parties hereto to enter into a mutual contract and agreement for medical, surgical and hospital attendance for the employes of the party of the second part employed as aforesaid, and for the benefit of said employes who may elect to receive the benefits of such hospital agreement, which said agreement is to be in conformity with and in pursuance of the provisions of the 'Workmen's Compensation Act,' of the State of Idaho, effective January 1, 1918, and amendments thereto, and in lieu of the provisions of Section 6229 thereof;

Now, Therefore, It is mutually agreed by and between the parties hereto as follows, to-wit:

The said party of the first part agrees to provide to each and

Dr. J. C. Woodward. June 20, respondent, suffering with an inflammation or lesion of such left testicle, which was swollen and painful, consulted with Dr. J. C. Woodward, who, after administering intermediate palliative treatment, removed the testicle, November 27, 1939. Respondent left the Payette General Hospital, December 2, 1939, in apparently good condition. December 10, however, Dr. J. C. Woodward discovered a painless, smooth, and readily felt tumor in the lower left portion of respondent's abdomen. Medicine was given by Dr. J. C. Woodward and an X-ray examination made, resulting in no diagnostic result. The latter part of December respondent consulted Dr. Palmer in Ontario, Oregon, who ascertained from Dr. Woodward that the pathological report on the testicle showed there was a seminoma or highly malignant growth. Whereupon Dr. Palmer advised respondent that the enlargement in the groin was probably an extension from the original growth in the testicle and that an operation was the only certain way to remove it. Respondent had received substantially the same information from Dr. Pittinger in Boise. The appellant contract physician advised respondent prior to his seeing Dr. Palmer that he would afford him complete medical service

every person employed by the party of the second part, in the occupations and locations above mentioned, who shall elect to receive the benefits of this agreement and shall contribute to the party of the first part above mentioned, all necessary and reasonable medical, surgical and hospital attendance, medicines, nursing, crutches and apparatus, by its physicians and surgeons and in the above mentioned hospital and also care and treatment by specialists in Eye, Ear, Nose and throat, in Boise, Idaho

1. For sickness contracted during the employment (except venereal diseases and sickness as a result of intoxication.)

2. For injuries received arising out of and in the course of employment, and

3. For other injuries received during the employment of such person by the party of the second part, save and except injuries caused by an employe's willful intent to injure himself or to injure another, or by his intoxication, or due to personal difficulties or to unlawful acts done or attempted.

Such medical and surgical care shall be held to include such reasonable care as may be required immediately after the development of a sickness or after an injury and for a reasonable time thereafter, and such hospital attendance and nursing shall be held

and hospitalization and would give him everything that was demanded by his case for his good, and that if he went to any other doctor he must pay his own bill; he did not however tell respondent his exact condition or that any particular operation was necessary or that X-ray treatments were proper or necessary or offer to give him X-ray treatments. Dr. Palmer opened the abdomen and discovered the growth, because so extensive, was not removable, as to do so would have resulted fatally, whereupon the incision was sewed up. Respondent did not again return to the contract physician, who, according to respondent, had told him, after being advised what Dr. Palmer had suggested, that the condition was incurable and nothing could be done about it and offered $75 for a complete release from further care or liability. Respondent did not accept the $75 or sign a release. After the operation respondent consulted Dr. Popma at Boise, an X-ray specialist, who thereupon administered deep therapy, which reduced the lump in his side from about the size of an orange to such an extent that it could not be felt at the time of the hearing herein, February 17, 1940.

February 7, 1940, respondent instituted this proceed-

to include hospital care and nursing in the above hospital or elsewhere only for such conditions and for such length of time as may be reasonably necessary for the proper treatment of the conditions presented, and such care shall be held to include an ambulance or other proper conveyance furnished by the party of the first part whenever required to convey the sick or injured from all points within the city limits of Payette to a hospital, or such proper place for the reception, care and treatment of sick or injured, but not to include hospital care for conditions existing before the employe became contributor hereunder, nor room and board for minor, ambulatory, or convalescent conditions while treatment in hospital is not required. The refusal of an employe to consult with the surgeon of the party of the first part, or to comply with instructions as to treatment or the employment by the employe of treatment or care not authorized by the party of the first part shall be considered as a waiver of his rights to, and shall disqualify him from further benefits for that condition or its complications.

The said party of the first part also agrees that such services, attendances and treatments so to be rendered as aforesaid by said · party of the first part to such employes of the party of the second part as shall elect to receive the same, shall at all times be under

ing before the Industrial Accident Board to compel his employer and its insurance carrier, the State Insurance Fund, and the contract physician to pay the expenses of the operation performed by Dr. Palmer and the X-ray treatments and their continuation, as necessary. The employer and the Fund defended on the ground that by reason of the hospital contract, approved by the Board, they were relieved of any further responsibility or liability, and have appealed from the order adverse to them in this respect.

The contract physician has appealed from the order requiring him to reimburse respondent, urging two defenses: first, he offered full treatment, which was declined, and therefore, under the contract, was relieved from further liability, that his liability ceased prior to the time of the operation performed by Dr. Palmer and the treatment given by Dr. Popma because of this clause in the contract:

"The refusal of an employe to consult with the surgeon of the party of the first part, or to comply with instructions as to treatment or the employment by the employe of treatment or care not authorized by the party of the first part shall be considered as a waiver of his rights

the supervision of the Industrial Accident Board of the State of Idaho, provided for in said 'Workmen's Compensation Act,' and said party of the first part further agrees that he will from time to time, in manner and form as said Industrial Accident Board may require, make to said Board reports of such services, attendances and treatments, and of his receipts and disbursements on account of such services so to be rendered.

The said party of the second part, in consideration of the agreements herein contained, to be kept and performed by the party of the first part, agrees that it will deduct, withhold and collect the sum of One Dollar ($1.00) per calendar month from the wages or earnings of each and every one of its employes who shall have elected to receive the benefits of this agreement and medical, surgical and hospital attention herein provided for and who is employed in any of the occupations and territories hereinbefore mentioned for a period of more than ten (10) days in any calendar month, and the sum of ten cents (10c) a day from the earnings of each of such employes who is employed ten (10) days or less in any calendar month, and that it will promptly, on each monthly pay day of said party of the second part, account for and pay over to said party of the first part the total amount so collected, and so

to, and shall disqualify him from further benefits for that condition or its complications."

Also, that the care and treatment afforded by the contract physician was all that the clause requiring "such reasonable care" justified, in that the X-ray treatments were in the nature of special expert services not contemplated by or covered by the contract.

Section 43-1107 requires the employer to provide for an injured employe such reasonable medical, surgical or other attendance or treatment, nurse and hospital service, medicine, crutches and apparatus, as may be required or requested by the employe immediately after the injury and for a reasonable time thereafter. If the employer fails to provide the same, the injured employe may do so at the expense of the employer. Section 43-1108 permits the employer and employe to waive the provisions of the above section and enter into mutual contracts or agreements providing for hospital benefits and accommodations to be furnished to the employe.

"Such hospital contracts or agreements must provide for medical, hospital and surgical attendance for such employee for sickness contracted during the employment (with certain exceptions not important herein), as well

due to said party of the first part, and Fifty per cent (50%) thereof additional on its own account, and such payments so to be made as aforesaid to said party of the first part shall be accepted by said party of the first part as full compensation for said services herein provided to be rendered to such employes of the said party of the second part who shall elect to receive the same; provided, however, that if an employe on entering the service of the party of the second part presents a receipt properly executed by his former employer on blank furnished by the party of the first part, showing that he has contributed to the party of the first part, the full sum of One ($1.00) Dollar for that calendar month under the terms of a similar contract, he shall not be required to make further contributions for that calendar month, but if he has contributed less than One ($1.00) Dollar in that calendar month or has been contributing to some other hospital service, then deductions shall be made for that calendar month as from any other new employe beginning with the date of employment.

The said party of the second part will transport disabled employes to the nearest hospital operated by the said party of the first part and will care for or dispose of all persons not entitled to care by the first party hereunder, and will permit a representative

as for injuries received arising out of and in the course of the employment."

The essential differences between a hospital contract under 43-1108 and the medical care and attention required under 43-1107 are that under the hospital contract permitted in 43-1108 the employe contributes direct payments and, on the other hand, receives sick benefits not furnished under 43-1107. Under 43-1108 the employer receives some contribution from the employe toward the furnishing of medical care and attention which the employer does not receive under 43-1107, the employer, on the other hand, not being required under 43-1107 to render any sick benefits. The insurance carrier is concerned as to whether or not the employer, in the first instance, and the carrier, in the second, is relieved of liability by contract entered into under 43-1108, because

---

of the first party, if he should so desire, to audit its payrolls and accounts with reference to this contract at such times as may be mutually convenient.

This contract and agreement shall take effect as of Sept. 1, 1937, and may be terminated on the first of any month by either party hereto giving the other party written notice, at least sixty (60) days before the date of the desired termination of this contract; provided, however, that the termination of this contract and agreement shall not relieve the party of the first part of his duty to provide reasonable medical, surgical and hospital attendance for such employes of the party of the second part for sickness contracted during such employment and for injuries received arising out of and in the course of such employment, prior to the termination of this contract as herein provided. This contract shall remain in full force and effect until so terminated.

In Witness Whereof, the parties hereto have signed and executed this agreement in triplicate, the day and year first above written.

---------------------------------- Hospital
By Dr. I. R. Woodward
Party of the First Part

Dr. Dora J. P. Gerber
----------------------------------------
Witnesses as to Party of the First Part.
K. W. Hay
----------------------------------------
Witnesses as to Party of the Second Part.
By J. C. Palumbo
Its Owner
Party of the Second Part."

under 43-1107 the insurance carrier is required to see ·
that the employer complies with the contract which
would cover medical attention, and the premiums would
therefore probably be fixed accordingly. On the other
hand, if the employer and carrier are relieved by 43-1108,
a corresponding adjustment in the necessary premiums
would result. It would seem that 43-1108 is a distinct
and alternative method rather than a cumulative one
because of the bond required by 43-1109, which would
seem to take the place of the responsibility of the insur-
ance carrier under 43-1107.

In *Johnston v. White Lumber Co.*, 37 Ida. 617, 217 Pac.
979, the court expressly stated it did not pass upon the
point involved herein, namely, the question of the re-
sponsibility of the contract physician under 43-1108.

 Under 43-1005 and 43-1108, after a hospital con-
tract has been duly entered into and approved by the
board, the employer and his surety are relieved from
further liability for medical care and attention to the
employe. (*Epperson v. Texas-Owyhee Mining & Develop-
ment Co.*, 63 Idaho 252, 118 Pac. (2d) 745; *Western Hos-
pital Association v. Industrial Accident Board*, 51 Ida.
334, 6 Pac. (2d) 845; *Industrial Commission v. Hammond*,
77 Colo. 414, 236 Pac. 1006; *Murray Hospital v. Angrove*,
92 Mont. 101, 10 Pac. (2d) 577.) We expressly refrain,
however, from indicating any holding on the employer's
liability for furnishing the services of an incompetent
physician. (*Vessel v. Jardine Mining Co.*, 110 Mont. 82,
100 Pac. (2d) 75, 127 A. L. R. 1093.)

 The measure of responsibility for care, treat-
ment, hospitalization, etc., resting upon appellant contract
physician under this contract is at least equal to that
resting upon a physician and surgeon in the · exercise
generally of his profession. That standard has been fixed
by this court, under both sections 43-1107 and 43-1108,
as the exercise of the care and skill ordinarily exercised
by competent physicians and surgeons in the same or like
locality, in the light of present day learning and scientific
knowledge of, and professional advancement in the sub-
ject. *McAlinden v. St. Maries Ass'n*, 28 Ida. 657, 156 Pac.

115; *Johnston v. White Lumber Co.*, 37 Ida. 617, 217 Pac. 979; *Swanson v. Wasson*, 45 Ida. 309, 262 Pac. 147; *Davis v. Potter*, 51 Ida. 81, 2 Pac. (2d) 318. This is the general rule. *Whitesell v. Hill*, 101 Iowa 629, 70 N. W. 750, 37 L. R. A. 830; *Burk v. Foster*, 114 Ky. 20, 69 S. W. 1096, 1 Ann. Cas. 304, 59 L. R. A. 277; *Dorris v. Warford*, 124 Ky. 768, 100 S. W. 312, 14 Ann. Cas. 602; Stewart, *Legal Medicine*, p. 240; Witthaus & Becker, *Medical Jurisprudence, Forensic Medicine and Toxicology*, p. 82; *Kirchner v. Dorsey & Dorsey*, 226 Iowa 283, 284 N. W. 171; *Turner v. Stoker*, (Tex.) 289 S. W. 190; *Kuhn v. Banker*, 133 Ohio St. 304, 13 N. E. (2d) 242, 115 A. L. R. 292.

If the employe does not receive such care and treatment from the contract doctor, he may then seek it elsewhere. *Johnston v. White Lbr. Co.*, 37 Ida. 617, supra.

The contract by providing for specialists in the diseases of the eye, ear, nose, and throat at Boise did not exclude other modern scientific treatment, because it stated specifically that:

"Such medical and surgical care shall be held to include such reasonable care as may be required immediately after the development of a sickness or after an injury and for a reasonable time thereafter, and such hospital attendance and nursing shall be held to include hospital care and nursing in the above hospital *or elsewhere* only for such conditions and for such length of time as may be reasonably necessary for the proper treatment of the conditions presented, and such care shall be held to include an ambulance or other proper conveyance furnished by the party of the first part whenever required to convey the sick or injured from all points within the city limits of Payette to a hospital, *or such proper place for the reception, care and treatment of sick or injured,* but not to include hospital care for conditions existing before the employe became contributor hereunder, nor room and board for minor, ambulatory, or convalescent conditions while treatment in hospital is not required. The refusal of an employe to consult with the surgeon of the party of the first part, or to comply with instructions as to treatment or the employment by the employe of treatment or care

not authorized by the party of the first part shall be considered as a waiver of his rights to, and shall disqualify him from further benefits for that condition or its complications."

The evidence showed, in keeping with approved modern methods deep therapy by X-ray or radium treatments,[2] since it is virtually agreed and undisputed that an operation would probably have been fatal, were the only effective treatments. Dr. J. C. Woodward, referring to the malignant growth with which respondent employe was afflicted, variously referred to as carcinoma or seminoma, testified for appellant as follows:

"A. I don't think that (tumor) could be taken out without killing him (respondent).

Q. Some type of treatment is necessary, is it not?

A. If you have any.

Mr. SUPPINGER: What is that?

A. If you have any type of treatment that is effective.

Q. If treatment were given the claimant and he had been in pain prior to the time treatment was given him and that pain immediately was, or almost immediately was relieved, and over a period of several months the pain had practically left and the tumor practically disappeared as to the eye, would you consider that effective treatment?

A. Not necessarily. I believe deep radiation will give temporary relief to this tumor. Whether or not it is permanent, is another question.

Q. Don't you consider it worth something if it alleviates the pain and suffering over a period of months?

A. Certainly.

Q. Then you would consider it necessary and proper treatment?

A. I think it is treatment but I don't know that it is necessary.

---

[2] Peterson, Haines & Webster, *Legal Medicine and Toxicology*, Vol. 2, p. 954; Maloy, *Legal Anatomy and Surgery*, p. 734; Christopher, *A Textbook of Surgery*, p. 1434; Cecil, *A Textbook of Medicine*, p. 1368; Waters and Kaplan, *The 1939 Year Book of Radiology*, pp. 491-8; Pohle, *Clinical Roentgen Therapy*, pp. 449-60; Pack and Livingston, *Treatment of Cancer and Allied Diseases*, Vol. 3, pp. 1948-59.

Q. Would you consider it necessary for him to suffer without that treatment if it can be provided and the suffering eliminated?

A. I think the alleviation of pain is a good thing no matter by what means accomplished.

Q. If the X-ray treatment you have heard referred to and described by Dr. Popma alleviates that suffering that would be better than medicine, than drugs?

A. Not necessarily.

Q. Don't you consider it better than drugs?

A. No. Because it has other repercussions. It is possible to get an over dose.

Q. Of what?

A. X-ray therapy. The expert should know how much and how little to give.

Q. If it was given in expert hands then you would consider it effective treatment?

A. It should be effective.

\* \* \* \* \* \* \* \*

A. I did not recommend the X-ray treatment and as far as changing the medicine I gave him, I gave him whatever I thought he needed.

Q. You gave him medicine in the liquid form and also capsules after that?

A. I don't remember exactly."

And the testimony of Dr. POPMA:

"Q. State whether or not the treatment you are giving him is the only prescribed treatment recognized by medical science at this time for a tumor such as he has.

A. No. It is not the only recognized one.

Q. What are the other treatments?

A. Treatment with a radium pack, with large quantities of radium up to 4 and 5 grams.

Q. Aside from this X-ray and radium treatment is there any other?

A. Occasionally these cases are operated upon, a very wide spread operation removing all glandular tissue to which the tumor has spread.

Q. I mean in cases where an operation would be fatal.

A. Then the only recognized treatment is X-ray or radium treatment.

Q. Those are the only ones?

A. Yes.

\* \* \* \* \* \* \* \*

Q. You spoke about three different types of treatment for a condition such as he has?

A. Yes.

Q. The radium treatment?

A. Yes.

Q. And X-ray?

A. Yes.

Q. And operation. Is that correct?

A. Yes.

\* \* \* \* \* \* \* \*

Q. With respect to the probable time that the claimant may survive under these different types of treatment and whether or not one has any advantage over the other?

A. This is an inoperatable case so that there cannot be surgery. There is no difference between the final effect of X-ray and radium packs.

Q. Which are you giving now?

A. X-ray. The length of time which he will live I am totally unable to say. Some live six months and others fifteen years. As far as the individual is concerned no one can tell ahead of time.

Q. Do you feel the type of treatment you are giving will give him the greatest length of survival?

A. I believe it all.

Q. What in your opinion would have been the result if you had not immediately begun to give him treatment and the type of treatment that you did give him? What would have been the result?

A. The tumor mass would have grown further.

Q. What effect would that have?

A. He would have had more pain, more discomfort.

Q. With respect to his surviving?

A. Certainly his life span would have been shortened.

Q. As a matter of fact the progress in that respect

would have been very rapid, would it not? Had not the treatment been given that you gave the progress of this condition would have been very rapid?

A. I rather think it would in this instance.

Q. The tumor would have spread throughout his system, throughout his body?

A. Yes.

Mr. LANGLEY: I think you said a while ago that in your opinion if this man were given the treatment which you recommend, he would have one chance in ten of a permanent cure. Was that your statement?

A. In the treatment of cancer we speak in terms of 5 ,7, and 10 year cures. If we have a patient and we treat him for a period of five years which he survives, we deem he has been cured.

Mr. LANGLEY: Is there anything else?

A. So I based my percentage figure at 10% possibility of a cure on this fact that if he is alive from 5 to 7 years from now we would call him cured."

The mere fact that by the X-ray treatment respondent was perhaps not entirely cured but had only a ten per cent chance to live, in view of the fact that the growth was greatly reduced and the testimony shows his life thereby probably prolonged and his pain was to a considerable extent alleviated, would justify the conclusion that this was correct and therefore incumbent treatment. (*London Guarantee & Accident Co. v. Industrial Commission,* 72 Colo. 177, 210 Pac. 70; *United States Fidelty & Guaranty Co. v. Department of Industrial Relations,* 207 Cal. 144, 277 Pac. 492; *Postal Telegraph Cable Co. v. Industrial Accident Commission,* 213 Cal. 544, 3 Pac. (2d) 6; *Hart v. State Industrial Accident Commission,* 119 Cal. A. 200, 6 Pac. (2d) 348; *Eberle v. Miller,* 170 Minn. 207, 212 N. W. 190; *W. J. Newman Co. v. Industrial Commission,* 353 Ill. 190, 187 N. E. 137.)

The appellant physician and his associate frankly stated in their testimony they did not offer or suggest to respondent X-ray treatment. Appellant physician or his associate did not advise or tell the respondent he should have an exploratory operation, and while the offer was

made generally for necessary services, appellant did not tell the respondent his specific condition or what was even necessary in a preliminary way. The general offer therefore did not relieve appellant from the responsibility of reimbursing respondent for the operation performed by Dr. Palmer which was clearly necessary as a proper means of definitely diagnosing the condition and determining what treatment would be effective. After all, it was respondent's body which was to be operated upon, and his failure to avail himself of appellant's offer was not capricious but had a justifiable and legitimate basis in the fact that Dr. Palmer had definitely stated what should be done, while appellant had not, and in fact had indicated that respondent's condition was hopeless and helpless. Respondent was not required to accept the contract care under these circumstances. (*Carmody v. City of St. Paul,* 207 Minn. 419, 291 N. W. 895; *Morrell v. City of Austin,* 208 Minn. 132, 293 N. W. 144.) The courts have recognized the right of the employe to secure other medical service without forfeiting the right to have the expense taken care of by the employer where satisfactory treatment is not being given or inadequate cure being obtained. (*Los Angeles County v. Industrial Accident Commission,* 13 Cal. A. (2d) 69, 56 Pac. (2d) 577.)

Physicians are required to keep abreast of and use best modern methods of treatment, and in so doing they may not unduly and narrowly restrict or confine their responsibility to the immediate place where they are practicing. We' may take judicial notice that the distance between Payette and Boise is in the neighborhood of 65 miles, that the facilities at Boise are readily accessible to the respondent employe at moderate cost to him, since he availed himself of this service when it was not either suggested or furnished by appellant physician, and his expense therefor up to the trial being only $20 for hospital and $80 for the X-ray treatment.

In *Johnson v. White Lumber Co.,* 37 Idaho 617, the X-ray was used to assist in securing proper union of a broken bone. Herein the X-ray was used for treatment. But certainly if the court considered it was proper and permissible for the employe to go from Laclede to Spo-

kane, a distance between fifty and sixty miles, in order to secure proper facilities which were not present at Laclede, it would be far more justifiable to hold that the contract physician herein was under the necessity of furnishing X-ray facilities for treatment available in Boise at no greater distance from Payette than Spokane was from Laclede. In other words, while the precise point was not particularly argued the Court concluded Spokane was so much a part of the locality or community of Laclede that the facilities available at Spokane should have been furnished either at Spokane or by the contract physician whose hospital was at Laclede. Applying that holding herein clearly justifies imposition of these expenses against the appellant physician under his bond.

In *Tvedt v. Haugen,* 70 N. Dak. 338, 294 N. W. 183, 132 A. L. R. 379, 1940, plaintiff on April 1 suffered a spiral fracture of the tibia and a rough transverse fracture of the fibula, at Larimore, Grand Forks County, North Dakota. Defendant first examined through a fluoroscope, reduced the fractures, and applied a splint. The next day he applied a plaster cast and took an X-ray picture. Plaintiff remained at defendant's hospital for two days and was admonished by the physician to stay in bed about thirty days. From then on at various times until about September 17 the physician advised that the leg would be all right. About two weeks thereafter plaintiff consulted another physician at Crookston, Minnesota, who advised there had been no union. He thereupon went to Fargo, North Dakota, which is approximately 106 miles from Larimore, where he was operated upon after X-ray pictures were taken, and ultimately the proper union resulted. Plaintiff sued the original physician for malpractice in that he failed to take proper X-ray pictures and had failed to advise that the leg was not making a proper recovery and there had been improper treatment. Among other defenses, it was interposed that because the defendant physician did not have an adequate X-ray machine at Larimore he was under no obligation to afford treatment other than that which he was capable of doing at that place. With regard to this and the failure of the

defendant to properly advise the plaintiff as to the condition of the leg, the fact that it was not healing properly, the court said:

"Notwithstanding this, he did not inform the plaintiff of the seriousness of the situation. He stated to him something which was untrue. Plaintiff's leg was not getting along fine, but quite the contrary. Defendant must have known, or should have known, that there was something wrong about it. He did not inform the plaintiff as to his true condition. Neither did he inform him as to another method of treatment that was accessible within easy reach. According to the evidence the defendant recognized at once when he was informed of plaintiff's consultation with Dr. Oppegard at Crookston, that the situation required the services of a bone specialist, but he had never called this to the attention of the plaintiff before. See, *Beardsley v. Ewing,* 40 N. D. 373, 382-383, 168 N. W. 791, 793, 794. The duty of a doctor to his patient is measured by conditions as they exist, and not by what they have been in the past or may be in the future. Today, with the rapid methods of transportation and easy means of communication, the horizons have been widened, and the duty of a doctor is not fulfilled merely by utilizing the means at hand in the particular village where he is practicing. So far as medical treatment is concerned, the borders of the locality and community have, in effect, been extended so as to include those centers readily accessible where the appropriate treatment may be had which the local physician, because of limited facilities or training, is unable to give.

"This Court has held that a doctor does not perform his duty to his patient when he fails to employ available and well known means of diagnosis such as the taking of X-ray photographs, even though no X-ray machine is available in the village where he is practicing, but where one is available at some point within easy access. *Whitson v. Hillis,* 55 N. D. 797, 215 N. W. 480."

The court in *Whitson v. Hillis,* 55 N. D. 797, 215 N. W. 481, said:

"It is urged that, inasmuch as the defendant is sought to be charged with the failure to exercise that de-

gree of diligence and skill which is ordinarily possessed by physicians and surgeons practicing in similar localities and in the same general line of practice as the defendant (*Hanson v. Thelan,* 42 N. D. 617, 173 N. W. 457), it was improper to submit the cause to the jury without expert testimony to establish this standard, and authorities are cited to substantiate the contention, among which are the following: *Houghton v. Dickson,* 29 Cal. App. 321, 155 P. 128; *McGraw v. Kerr,* 23 Colo. App. 163, 128 P. 870; *Miller v. Toles,* 183 Mich. 252, 150 N. W. 118, L. R. A. 1915C, 595; *Berkholz v. Benepe,* 153 Minn. 335, 190 N. W. 800; *Lorenz v. Lerche,* 157 Minn. 437, 196 N. W. 564; *Tady v. Warta,* 111 Neb. 521, 196 N. W. 901.

"There is no question but that the general rule is as contended by the appellant, but we are of the opinion that where, as here, the defendant admits that he did not discover the fracture, and where he, being the first physician called, had the complete history of the case showing injuries that might well indicate one or more fractures at places other than those regarded by him as the principal locations of injury, and where there was willingness on the part of those who called him professionally to take the plaintiff to a place where an X-ray picture could be had to better disclose the extent of the injuries, there is substantial evidence from which the jury could say that the defendant failed to exercise that degree of care in the diagnosis and treatment of the plaintiff's injuries which is to be expected of a physician, regardless of any particular standard. The jury must be presumed to have some knowledge concerning matters upon which physicians may have superior knowledge. They have general knowledge of the efficacy of the X-ray and of its desirability as an aid to diagnosis in cases of bone and joint injuries. They have general knowledge of the laws of physics, and may be presumed to know something of the facility with which the relation between a supposedly broken bone and a turning out of a dependent extremity can be determined, at least after swelling has somewhat subsided. In the absence of testimony explaining why an X-ray picture was not desirable in the circumstances and how the failure to have it taken may be consistent with

the exercise of a proper degree of care on the part of the physician, the jury is warranted in our opinion, in concluding from their general knowledge of the use of the X-ray in such cases that the failure to employ it when available, as it must be assumed to have been here, was negligence. Likewise, we have here the unexplained evidence showing a more or less continuous treatment for a fracture of the tibia some six inches above the ankle joint from the 1st of January until March, coupled with the admission on the part of the defendant that the bone was not broken at that point, and his failure to discover it until March. Although the failure to discover the actual fracture at the time and while the injury was fresh might well be accounted for consistently with the exercise of a proper degree of professional skill, leaving the question of the X-ray to one side, the unexplained failure to discover the fracture during the period of two months and the continued treatment for a fracture that did not exist for so long a period of time may well be regarded as inconsistent with the exercise of due care and skill measured according to any supposed professional standard. In other words, from this evidence, unexplained, the jury may draw an inference, based upon their common knowledge, that physicians, in constant attendance, and in the exercise of due care, would not treat a patient for this period of time for a fracture that did not exist, and would not fail for so long a period to make such examinations and tests as would locate the seat of the trouble elsewhere. We are of the opinion that there was sufficient evidence in the instant case to form a question of fact for the jury, and that the judgment appealed from must be affirmed."

In *Los Angeles County v. Industrial Acc. Commission,* 202 Cal. 437, 261 Pac. 295, the employer objected to being required to pay for treatment to the injured employee on the ground it was beyond the requirements of the statute similar to ours with regard to furnishing of medical, surgical, and hospital treatment, etc., on the ground it had to do with correcting disfigurement and required the services of specialists and was therefore not covered. The court held to the contrary, however; and in effect this court has, as to compensation, approved such proposition

in *Olson v. Union Pacific R. Co.*, 62 Idaho 423, 112 Pac. (2d) 1005. See also *Wilson v. Brown-McDonald Co.*, 134 Neb. 211, 278 N. W. 254.

In *Viita v. Fleming*, 132 Minn. 128, 155 N. W. 1077, L. R. A. 1916D 644, as early as 1916 the court in considering the availability of X-ray equipment and the necessity of resorting thereto in keeping with modern science did not give the locality a narrow or confined construction, the Minnesota supreme court stating:

"We think it is plainly correct that the locality in which the physician or surgeon practices must be considered in determining whether he has the requisite skill and learning, but we do not think he is bound to possess and exercise only that degree of skill and learning possessed by other practitioners in the same locality, if by that is meant the same village or city. If the same general locality is meant, as, for instance, the Northwest, or the state, no fault could be found with such a rule. But in these days the physician or surgeon in a village like Cloquet is not hampered by lack of opportunity for advancement. Frequent meetings of medical societies, articles in the medical journals, books by acknowledged authorities, and extensive experience in hospital work, put the country doctor on more equal terms with his city brother. He would probably resent an imputation that he possessed less skill than the average physician or surgeon in the large cities, and we are unwilling to hold that he is to be judged only by the qualifications that others in the same village or similar villages possess. The instructions requested provided too narrow a standard, and the court was justified in refusing them, and giving, instead, the instruction that among the circumstances to be considered was the location of the physician in Cloquet, rather than in Duluth, St. Paul, or some other place."

Cloquet is approximately 21 miles from Duluth and 140 miles from St. Paul.

In argument appellant queried as to whether, if he should be required to furnish treatment in Boise, he would be required to furnish such treatment as might be afforded at the Mayo Clinic or in New York City. The

complete answer is that we are not confronted with any such situation.

It was not a question of lack of skill, knowledge, or judgment, but a failure to give the treatment which was admittedly known, recognized, and considered to be proper; not a failure to know, but a failure to act, because not possessed or readily available, but was shown to be standard treatment and sufficiently accessible to lie within the limits of the community orbit governing the standard of treatment binding upon appellant and covered by his contract of employment for the benefit of cross-appellant company's employes.

The lodestar of liberal construction[3] of the Workmen's Compensation Law, requiring, if possible, the rehabilitation of injured employes and correct treatment of them, clearly justifies the conclusion herein.

The order of the Board is affirmed, except the employer and the Fund are relieved from further liability. Each party to pay his, their, or its own costs.

Budge, C.J., Ailshie, J., and Buckner, D.J., concur.

HOLDEN, J.—Dissenting in part and concurring in part.—Insofar as the foregoing opinion holds that by reason of the making of the hospital contract, and its approval by the board, the fruit company and its surety, the State Insurance Fund, are relieved of all liability to claimant, and that the contract doctor is liable for the

---

[3] *McNeil v. Panhandle Lumber Co.*, 34 Ida. 773, 203 Pac. 1068; *Flynn v. Carson*, 42 Ida. 141, 243 Pac. 818; *In re Hillhouse*, 46 Ida. 730, 271 Pac. 459; *In re Larson*, 48 Ida. 136, 279 Pac. 1087; *Burchett v. Anaconda Copper Min. Co.*, 48 Ida. 524, 283 Pac. 515; *Ramsay v. Sullivan Mining Co.*, 51 Ida. 366, 6 Pac. (2d) 856; *Reinoehl v. Hamacher Pole etc. Co.*, 51 Ida. 359, 6 Pac. (2d) 860; *Cooper v. Independent Transfer etc. Co.*, 52 Ida. 747, 19 Pac. (2d) 1057; *Dorrell v. Norida Land & Timber Co.*, 53 Ida. 793, 27 Pac. (2d) 960; *Kelley v. Prouty*, 54 Ida. 225, 30 Pac. (2d) 769; *Beaver v. Morrison-Knudsen Co.*, 55 Ida. 275, 41 Pac. (2d) 605; *Pierstorff v. Gray's Auto Shop*, 58 Ida. 438, 74 Pac. (2d) 171; *Chamberlain v. Bowersock Mills & Power Co.*, 150 Kan. 934, 96 Pac. (2d) 684, 129 A.L.R. 654.

payment of the expense of the exploratory operation, I dissent.

Otherwise I concur.

Buckner, D.J., sat in place of Morgan, J., who deemed himself disqualified.