Chester **RIEDINGER** and Jannette Riedinger, husband and wife, Plaintiffs,

v.

R. C. **COLBURN** and Jane Doe Colburn, husband and wife, Defendants.

Civ. No. 2–72–15.

United States District Court, D. Idaho.

July 31, 1973.

John S. Moore of Velikanje, Moore, Countryman & Shore, Yakima, Wash., and Herbert Nagel, Coeur d'Alene, Idaho, for plaintiffs.

Jerry V. Smith, Lewiston, Idaho, for defendants.

## MEMORANDUM DECISION

J. BLAINE ANDERSON, District Judge.

The Memorandum Decision of July 27, 1973 is hereby withdrawn and the following Memorandum Decision is substituted in its stead.

This action charging medical malpractice was brought by the plaintiffs, Chester and Jannette Riedinger, husband and wife, who were at all times material residents of Clarkston, Washington, against the defendants, Dr. R. C. and Jane Doe Colburn, husband and wife, who were at all times material residents of Lewiston, Idaho. Since the amount in controversy exceeds $10,000.00 and diversity of citizenship exists, this Court has jurisdiction of the action under 28 U.S.C.A. § 1332.

Trial of this matter was held May 1, 2 and 3, 1973, the Court sitting without a jury. A general factual presentation of plaintiffs' case as developed by pre-trial stipulations and trial evidence is necessary; to be followed with specific de-

tails developed with each party's contentions. Plaintiff, Jannette Riedinger, suffered a "whiplash" neck injury in an automobile accident in May, 1967. In May of 1969, to correct problems sustained in that injury, plaintiff underwent corrective surgery known as "anterior cervical excision" at the Harborview Hospital, Seattle, Washington, performed by a Dr. White. The nature of that operation in a simplified fashion was to approach from the anterior and right side of plaintiff's neck, make a small incision slightly below the Adam's apple, spread various tissues to get at the site, then remove the intervertebral disc lying between the 5th and 6th cervical vertebrae. Those vertebrae were not "fused" at that time. This operation appeared to give plaintiff a good deal of relief from the neck pains, but in the fall of 1969 into the early part of 1970, plaintiff began to complain of pains in the hips, legs, elbows and wrists and sought the assistance of one Dr. Bond. In February of 1970 Dr. Bond referred plaintiff to the defendant, at which time Dr. Colburn examined her and recommended "conservative" treatment in the nature of heat, analgesics and exercise. At that meeting plaintiff told Dr. Colburn about her anterior cervical excision and the Doctor expressed doubt that the operation had anything to do with her leg problems. Plaintiff wasn't sure whether "fusion" was attempted in her previous operation. On March 23, 1970, plaintiff was again examined by the defendant. In the interval between this meeting and the previous one, Dr. Colburn had learned through Dr. Bond that no fusion had taken place in plaintiff's Seattle operation. He discussed that fact with the plaintiff and told her he was surprised, since the commonly-accepted practice in orthopedic surgery is to fuse the vertebrae after performing anterior cervical disc excision. Since plaintiff had shown slight improvement over the February appointment, the defendant recommended a continuation of the same conservative treatments. However, he did discuss the possibility of vertebral fusion with the plaintiff as a possible alternative to eliminating some of her pains. This discussion was a very general one—the Doctor describing in general and simplified terms the procedure involved, i. e., that he would perform the same operation as was performed in Seattle, except that a small chunk of bone would be removed from her hip bone (iliac crest) which would be shaped to be inserted between the 5th and 6th cervical vertebrae to bring about fusion and, hopefully, more neck stability.

Plaintiff's next consultation with the Doctor was by telephone on April 28, 1970. Mrs. Riedinger had cleaned her house that day and complained of more than usual neck pain. Dr. Colburn then recommended the surgical process he had described earlier, to which the plaintiff consented. Surgery was scheduled for May 4, 1970, with the plaintiff checking into the hospital on May 3. Defendant visited the plaintiff briefly before surgery for a pre-surgical examination, but little communication took place except for another general explanation of the surgical procedure and of the post-operative course. Defendant performed an anterior cervical fusion of the 5th and 6th vertebrae as scheduled. Plaintiff did not recover from surgery as quickly as expected, and, in fact, developed some temporary: (1) difficulty with swallowing and hoarseness; (2) nausea; (3) discoloration of the lower throat and upper torso; (4) a hallucinatory reaction to certain drugs, and (5) difficulty with breathing and speaking. It is the last [Number 5] of these complications which remained permanently that is the subject of this lawsuit.

At this point it is necessary to explain and establish two inescapable conclusions. First, that the surgery Mrs. Riedinger consented to can be termed major "elective" surgery. It is major in the sense that it is not without the same risks inherent in any operation involving an attack on body tissues under a general anesthetic. It is "elective" in the sense that it is not necessary as a mat-

ter of life and death, but rather is a matter of choice to the patient depending upon his or her desire to try to eliminate problems of discomfort. The second conclusion is that Mrs. Riedinger has since her surgery and to this date suffered from *some* paralysis of her right vocal chord, which interferes with the power and quality of her voice. The degree of impairment will be reserved pending discussion of other legal issues. And further, that the paralysis of her right vocal chord was caused by *some* form of damage to plaintiff's right recurrent laryngeal nerve, either during, or because of, the surgery performed by the defendant. This latter fact was established conclusively by the testimony of three doctors, including the defendant himself. That fact does not, however, establish any negligence on the part of the defendant.

Plaintiff, by way of pre-trial briefs and evidence presented at trial, raises two major contentions. First, she contends that the defendant has a duty to advise and warn plaintiff of known foreseeable risks of a permanent nature such as the risk to the right recurrent laryngeal nerve and alternative procedures so that she could give an informed consent to the operation. Plaintiff maintains that no such disclosure was made and the defendant was, therefore, negligent in his failure to do so. Defendant contends that there is no such duty or standard of practice among orthopedic surgeons in the medical community to warn, advise, or disclose the potential permanent risks of the nature plaintiff complains of in this operation.

 There is no case law in Idaho establishing the principle of informed consent or the standard to be applied if, in fact, such a principle should exist. Sitting as an *Erie* court, it then becomes this court's duty to predict what substantive course Idaho would choose if the issue was presented to its highest court. In Cobbs v. Grant, 8 Cal.3d 229, 104 Cal.Rptr. 505, 502 P.2d 1 (1972) the Supreme Court of California thoroughly discussed and analyzed various decisions on informed consent. After reviewing the rationales for a doctor withholding information from a patient, the court stated 8 Cal.3d at 243, 104 Cal.Rptr. at 514, 502 P.2d at 10:

"Therefore, we hold, as an integral part of a physician's overall obligation to the patient there is a duty of *reasonable disclosure* of the available choices with respect to proposed *therapy* and of the *dangers inherent and potentially involved in each.*

"A concomitant issue is the yardstick *to be applied in determining* reasonableness of disclosure." (emphasis supplied)

The *Cobbs* court then explored the various degrees of reasonableness expressed in other cases. The majority rule appears to be the standard as recognized by practicing physicians in the community. The *Cobbs* court, recognizing the inherent impropriety in permitting the medical profession to make what may be a patient's non-medical decision, concluded that the majority rule was "needlessly overbroad". The *Cobbs* court also considered what some courts have described as "full disclosure" and, likewise, rejected it as going too far for "common practicalities" and suggested it be limited by two qualifications: the first being that a doctor has no duty to give the patient a brief discourse on medical terminology and science; and, secondly, that there is no duty to discuss minor risks inherent in common procedures when the risks are of a very low incidence. In a complicated surgical process the court described the doctor's duty as follows:

" . . . when a given procedure inherently involves a *known risk of death* or *serious bodily harm,* a medical doctor has a duty to disclose to his patient the potential of death or serious [bodily] harm, and to explain in lay terms the complications that might possibly occur. Beyond the foregoing minimal disclosure, a doctor must also reveal to his patient such additional information as a skilled practitioner of good standing would provide under similar circumstances." (8 Cal.3d p.

244, 104 Cal.Rptr. p. 515, 502 P.2d p. 11)

In summary, the *Cobbs* court adopted as a rule of disclosure the medical community standard for general procedures, but when relatively complicated surgery is involved, a doctor must, in addition, disclose *known* risks of death or serious bodily injury. This court adopts that well-reasoned approach as a rule on informed consent, especially when major "elective" surgery is involved. Prior to an application of that test, it is mandatory to carefully view the evidence as to what was disclosed by the defendant to the plaintiff. The evidence is clear that: (1) Dr. Colburn did explain three possible general alternatives to plaintiff's neck problems, including a course of "conservative" treatment, a do-nothing approach, and finally, fusion surgery. (2) Dr. Colburn did explain to the plaintiff the general nature of the operation, that it was an approach from the anterior and right side and that he would employ the same incision as was made in her Seattle operation to avoid another neck scar; that a piece of bone would be taken from the hip bone (iliac crest) which would leave a temporary pain in the hip area; and that this bone fragment would be shaped to fit the disc area between the 5th and 6th vertebrae to cause fusion. However, excluding the above, the testimony of the two parties is in conflict. The doctor claims that he advised the plaintiff of various temporary post-operative discomforts, including hoarseness and difficulty with swallowing, on both the April 28th phone conversation and the May 3rd hospital visit. Plaintiff doesn't remember the doctor telling her of either of those post-operative discomforts. This court resolves this conflict in the testimony in favor of the defendant, especially in light of the fact that Mrs. Riedinger doesn't remember a visit by the defendant on the evening of May 3rd. Hospital records (Exh. 1) clearly reflect such a visit. It is understandable that Mrs. Riedinger would not remember the visit as she had been given a pre-operative sedative. However, that is not the crux of the informed consent issue under the facts of this case. There is no doubt that the doctor did *not* tell the plaintiff of any permanent risk to her right recurrent laryngeal nerve which directly affects vocal control over the larynx. The issue then becomes, under the test as adopted, whether or not the defendant had such a duty to warn plaintiff of such a risk. While there is no doubt that permanent voice damage is serious bodily injury, especially in light of the fact that this was "elective" surgery, it is the feeling of this court that no such duty existed; it is not a *known* risk. This holding is based on several indicia of evidence, the first being the most important. Dr. Floyd Johnson, a Boise, Idaho, orthopedic surgeon, who has performed or assisted in over one hundred anterior cervical fusion operations, testified that he has no personal knowledge of any permanent damage to the right recurrent laryngeal nerve affecting vocal transmissions. More important, Dr. Colburn related from medical texts four studies involving a total of in excess of 600 patients, where only 1–1½% suffered from temporary hoarseness and 0% suffered permanent vocal disturbance. It can only be concluded that permanent damage to the right recurrent laryngeal nerve, in turn causing permanent vocal chord paralysis, is virtually an unknown risk.

■ This court further holds that Dr. Colburn did advise, warn and discuss with the plaintiff those items which are required by custom of practicing physicians in the community. Those items as testified to by Dr. Johnson are the general nature of the operation and the post-operative course. Furthermore, according to the plaintiff's own testimony, she received nothing more than that from Dr. White in her Seattle operation; that is further evidence of a community standard for this type of operation.

■ Even if the defendant violated the adopted informed consent rule, there is no proof in this case that any such vi-

olation was the proximate cause of plaintiff's injuries. Predictably and understandably, plaintiff testified that she would not have had surgery had she been fully informed or informed of this possible result. It is not really her credibility either that is the stumbling block. An objective test is always to be preferred, i. e., what would a reasonably prudent person have decided if informed to the same extent as Mrs. Riedinger. Cobbs v. Grant, supra. The proof here supports the conclusion that a reasonable and prudent person would have consented to the surgery based upon Mrs. Riedinger's knowledge, past experience and symptoms.

 Plaintiff's second contention is that defendant was negligent in the performance of the operation itself. As a matter of logic, such a claim could infer either a wrong procedure was followed or that a proper procedure was negligently executed. Although the evidence does show that at least two approaches (anterior and posterior) to such a fusion operation exist, it is not seriously contended by the plaintiff nor would the record reflect that Dr. Colburn chose the wrong approach. To the contrary, the evidence shows that the defendant used the safest approach, considering all factors. Therefore, if any negligence exists, it must necessarily exist in the negligent execution of a proper approach. Dr. Colburn explained in detail the surgical procedure. In summary, after a scrubbing of the incision point on the neck and iliac crest areas, plaintiff was then administered a general anesthetic and a trachial tube inserted to preserve a constant oxygen supply. He then made a transverse incision on plaintiff about one inch in length at exactly the same place as was made in the previous Seattle operation by Dr. White. In order to expose the site, certain tissues were pulled or pushed to either side by a process known as "blunt" dissection. In this case the instruments used were a Richardson retractor and a thumb forceps. The former was held by a layman under Dr. Colburn's supervi-

sion and it retracted the visceral sheath and its contents, including the right recurrent laryngeal nerve laterally to the right side. The thumb forceps, held by the defendant, retracted the sterno-mastoid muscle and carotid sheath laterally to the left. Dr. Colburn encountered tissue scarring from plaintiff's previous operation in both the sterno-mastoid muscle area and around the cervical vertebral sheath, but termed it "normal" and not of a problematic nature. Once the site was exposed, Dr. Colburn made a small incision through the cervical vertebral sheath, inserted a needle to identify the vertebral level, and confirmed that with an X-ray as being the 5th and 6th. He then removed previous scar tissue and disc fragments. The retractors were then removed while a piece of bone was taken from the plaintiff's iliac crest, which was shaped to fit the plaintiff's intervertebral space. The retractors were reinserted and the plaintiff's neck was then protracted and the bone plug inserted. Both incisions were closed and the trachial tube removed. According to Dr. Colburn's testimony, no irregularities were encountered nor was there any deviation from standard procedure. The hospital records (Pl's Exh. 1) clearly support that testimony. In addition, Dr. Johnson, the only qualified orthopedic surgeon called on behalf of either side, testified that after reviewing the hospital records and listening to Dr. Colburn's explanation of the surgical procedure, he would agree that defendant's procedure was technically correct. There appears to be no direct evidence of any negligence on the part of the defendant in the execution of this anterior cervical fusion. Therefore, recovery by the plaintiff must be based on an application of the doctrine of *res ipsa loquitur* to establish the negligence of the defendant. There is no doubt that the doctrine can be applied in Idaho in medical malpractice actions. Hale v. Henninger, 87 Idaho 414, 393 P.2d 718 (1964); Walker v. Distler, 78 Idaho 38, 296 P.2d 452 (1956); Schofield v. Idaho

Falls Latter-Day Saints Hospital, 90 Idaho 186, 409 P.2d 107 (1965). The question before this court is whether or not under the facts and evidence of this case, it would be a proper application of the doctrine. Two requirements must be met as noted in *Hale, supra*, 87 Idaho at 422, 393 P.2d at 722:

"A plaintiff, seeking to invoke the doctrine must show: (1) that the agency or instrumentality causing injury is under the control and management of the defendant; and (2) that the circumstances were such that common knowledge and experience would justify the inference that the accident would not have happened in the absence of negligence."

This court has no difficulty in concluding that plaintiff met her burden of showing the first element. It is the second that causes more concern. In the more recent case of *Schofield, supra*, the Idaho Supreme Court again reaffirmed its position noted in *Hale, supra*, where it was stated on page 194 of 90 Idaho, on page 109 of 409 P.2d:

" . . . the doctrine *must* be limited to those cases where a *layman* is able to say *as a matter of common knowledge and observation* that the consequences of professional treatment were not such as ordinarily would have followed if due care had been exercised." (emphasis supplied)

█ The testimony of four expert witnesses, Dr. McNeill, an eye, ear, nose and throat doctor with a specialty in otolaryngology; Dr. Warden, a doctor with the same specialties; Dr. Johnson, an orthopedic surgeon; and the defendant, all offered some opinion as to the possible cause of the damage to the right recurrent laryngeal nerve. These can be summarized as: (1) severance of the nerve, (2) stretching or prolonged pressure on the nerve from retractors, (3) the formation of scar tissue pressurizing the nerve, (4) hematoma, (5) insertion of trachial tube, and (6) organic or toxic causes. It must be reiterated that there is no direct evidence of any of the above. It must be remembered that mere possibilities and suspicions are not sufficient. *Hale, supra*, 87 Idaho, p. 421, 393 P.2d 718. It must be further noted that the consensus of expert testimony is to the effect that the first two listed causes are much more probable than the latter four. None of the possible causes given are such that a layman from common knowledge and experience could infer that the accident would not have happened without negligence on the defendant's part. The application of *res ipsa loquitur* is no more applicable here than it was in *Hale, supra*. Rather, this unfortunate result was the type referred to as the "rare result" type in *Silverson v. Weber*, 57 Cal.2d 834, 22 Cal.Rptr. 337, 372 P.2d 97 (1962) quoted with approval in *Hale, supra*, 87 Idaho, at 424, 393 P.2d at 723:

" 'The fact that a particular injury suffered by a patient as the result of an operation is something that rarely occurs does not in itself prove that the injury was probably caused by the negligence of those in charge of the operation.' "

In plaintiff's supplemental trial memorandum filed on April 25, 1973, reliance is placed on the case of *Zebarth v. Swedish Hosp. Med. Center*, 81 Wash.2d 12, 499 P.2d 1 (1972), as establishing a more "equitable rule" of further use of the doctrine of *res ipsa* based on the testimony of expert witnesses to create inferences of negligence. Assuming *arguendo*, that that is a holding of the case, this court, as an *Erie* court, is bound to apply the law of this state when such law is clearly expressed by its highest court, irrespective of any personal feeling of equities. If the rule is to be relaxed, it must come from the Idaho Supreme Court. The plaintiff cannot recover as there has been no showing of negligence.

Costs are allowed to the defendants.

If counsel agree in writing filed with the court, this Memorandum shall constitute the findings of fact and conclusions of law; in which event, defendants' counsel shall submit a proposed judgment in favor of the defendants.