599 P.2d 292

**Ernest CONRAD, Plaintiff-Appellant,**

v.

**Gilbert C. ST. CLAIR, as Personal Representative of the Estate of G. L. Barnard, M.D., Deceased, Defendant-Respondent.**

No. 12479.

Supreme Court of Idaho.

July 5, 1979.

Rehearing Denied Sept. 14, 1979.

James Annest, of Annest & Anderson, Burley, for plaintiff-appellant.

R. Vern Kidwell, of Holden, Holden, Kidwell, Hahn & Crapo, Idaho Falls, for defendant-respondent.

BISTLINE, Justice.

In this action for medical malpractice, plaintiff Conrad sued the personal representative of the estate of Dr. G. L. Barnard, who died prior to the institution of the action.

Plaintiff, a field construction boilermaker, injured his back on August 26, 1971, while trying to lift a heavy object. A doctor in Utah gave him medication for the diagnosed muscular strain. After continued problems, he consulted his family physician, Dr. Gary Haddock of Blackfoot, Idaho. Dr. Haddock diagnosed a herniated intervertebral disc and hospitalized plaintiff from October 14 to October 21. Dr. Haddock recommended "conservative" treatment, mainly rest, but plaintiff was anxious to return to work and insisted upon exploring the possibility of surgery. Dr. Haddock referred plaintiff to Dr. Barnard.

Dr. Barnard admitted plaintiff to the hospital on November 7 and performed the surgery the next day, removing as much of the offending disc as was possible. However, after being released on November 17, plaintiff returned to Dr. Haddock several times, allegedly because Dr. Barnard would not give him an appointment, complaining of continued pain and disability. After consulting Dr. Barnard, Dr. Haddock prescribed physical therapy. Dr. Haddock testified that plaintiff was slowly responding; plaintiff claimed the therapy merely aggravated his condition.

Plaintiff failed to significantly improve and was hospitalized again on March 20. After surgery the following day, again performed by Dr. Barnard, he remained in the hospital until April 6. At times he complained of pain but at other times he indicated he was pleased with the surgery. However, once plaintiff was released his condition worsened again. He reported having to crawl to the bathroom because of loss of strength in his legs and also claimed a continued high fever of 103 degrees.

Plaintiff returned to Dr. Haddock on April 10 and was given pain medication and penicillin. X-rays were also taken. Both Dr. Haddock and Dr. Barnard apparently believed plaintiff was malingering, and Dr. Barnard suggested that plaintiff consult another surgeon. Dr. Barnard's records indicated, however, that he did feel plaintiff was 5% disabled. Plaintiff was referred to Dr. Gresham, who performed a third operation on June 21. He assigned plaintiff an

overall disability of 35% but found him 100% disabled for his prior occupation.

At trial, plaintiff attempted to show that Dr. Barnard had been negligent either in the surgery itself or in failing to properly diagnose and treat disc space infection. Plaintiff's primary witnesses were Dr. Haddock and Dr. Gresham. However, plaintiff was able to elicit little useful testimony from them, as might have been expected, both doctors having given affidavits in support of defendant's unsuccessful motion for summary judgment. Dr. Haddock testified that back surgery is only successful about 85% of the time and that the result here was hence not unusual. He also claimed that x-rays showed degenerative arthritis which would contribute to plaintiff's slow recovery and pain. Dr. Haddock stated that plaintiff's symptoms *could* indicate infection but could also be a normal post-operative reaction by the body. The most damaging testimony to plaintiff's case was Dr. Haddock's opinion that it was not the surgery that prevented plaintiff from working but the disease, that failure of the surgery to "cure" him did not show the infliction of any injury, and that surgical error was not more probable than further degeneration from the arthritis.

Dr. Gresham's testimony also did little to aid plaintiff's cause. He stated that three operations on one patient is not unusual, and that not only is it common to remove only part of the disc, but it is often dangerous to attempt to remove all of it. He indicated that further fragmentation of the disc could have caused plaintiff's recurring problems, and he saw nothing that indicated any surgical error on Dr. Barnard's part. Dr. Gresham further testified that the best procedure to diagnose infection would be to obtain a sample of the polymorphonuclear exudate ("pus") and culture it, but that this procedure is not always possible. He found insufficient signs to justify this procedure in plaintiff's case. He elected to administer general antibiotics, as had

Dr. Barnard, and stated his finding that the elevated temperature was a normal reaction, observing that it later dropped to normal. Dr. Gresham also mentioned that while he was out of town three other doctors substituting for him did not note having observed any infection.

After plaintiff rested, the court ruled as a matter of law that there was no evidence of any surgical error and took that issue from the jury. However, he did allow the jury to decide the issue of whether there was error in the post-operative care, *i. e.,* whether Dr. Barnard was negligent in failing to diagnose and treat infection. He did so on the basis of testimony as to plaintiff's symptoms and the best methods of diagnosis and treatment, leaving it for the jury to decide if Dr. Haddock and Dr. Gresham were correct in stating that, given the symptoms evidenced by plaintiff, Dr. Barnard was not negligent.

In addition, the trial court: 1) applied the prohibition of the "dead man statute," I.C. 9–202(3), and excluded plaintiff's testimony as to conversations had with Dr. Barnard on the risks of surgery;[1] 2) denied requested instructions that would impose an absolute duty on physicians to use the most modern techniques; and 3) denied instructions on *res ipsa loquitur.*

The jury found for Dr. Barnard. The court denied plaintiff's motion for a new trial and entered judgment upon the verdict. Plaintiff appealed, claiming error in the three rulings just enumerated, and also alleging that the evidence was insufficient to support the verdict in the doctor's favor.

## SUFFICIENCY OF THE EVIDENCE— TAKING THE ISSUE OF SURGICAL NEGLIGENCE FROM THE JURY— DENYING THE MOTION FOR A NEW TRIAL ON THE ISSUE OF POST–OPERATIVE NEGLIGENCE

It is axiomatic that "[o]n appeal from a judgment entered on a jury verdict, this court will not set aside the verdict if it is

---

1. Plaintiff wished to testify that he was *not* warned of the risks; the court kept this out, saying it would indirectly circumvent the stat-

ute as it would be only plaintiff's interpretation of what was said.

supported by substantial and competent evidence." *Stoddard v. Nelson,* 99 Idaho 293, 581 P.2d 339 (1978); *Mann v. Safeway Stores, Inc.,* 95 Idaho 732, 518 P.2d 1194 (1974).

> "By substantial, it is not meant that the evidence need be uncontradicted. All that is required is that the evidence be of such sufficient quantity and probative value that reasonable minds *could* conclude that the verdict of the jury was proper. It is not necessary that the evidence be of such quantity or quality that reasonable minds must conclude, only that they *could* conclude."

*Mann, supra,* 95 Idaho at 736, 518 P.2d at 1198. Thus, we must decide whether the evidence was such that reasonable minds could find for the defendant.

■ To prove a case in malpractice a plaintiff has the burden of proving several elements. First, the plaintiff must show that the physician was negligent in failing to use ordinary care.[2] *Hall v. Bacon,* 93 Idaho 1, 453 P.2d 816 (1969); *Willis v. Western Hospital Association,* 67 Idaho 435, 182 P.2d 950 (1947); *Swanson v. Wasson,* 45 Idaho 309, 262 P. 147 (1927). In addition, plaintiff must show that such failure to use ordinary care was the proximate cause of plaintiff's injury. *Hall, supra; Willis, supra; Swanson, supra; Flowerdew v. Warner,* 90 Idaho 164, 409 P.2d 110 (1965). The burden is on the plaintiff to affirmatively prove both negligence and causation (except in certain cases which we will discuss below); a mere suspicion of negligence is not enough. *Flowerdew, supra; Willis, supra; Hale v. Heninger,* 87 Idaho 414, 393 P.2d 718 (1964); *Evans v. Bannock County,* 59 Idaho 442, 83 P.2d 427 (1938).

■ As noted above, plaintiff chose to rely on testimony of his family physician, Dr. Haddock, and his second surgeon, Dr. Gresham. Both of these doctors testified (as did other witnesses) that they saw nothing in the records or during their examinations of plaintiff that showed any negligence in surgical procedures. Both testified that Dr. Barnard followed accepted surgical procedures, that plaintiff's continuing problems were not uncommon, and that the results were at least as likely due to further deterioration of plaintiff's original condition as due to surgical error. Plaintiff did not present any evidence of either negligence or causation, instead asking that negligence be inferred from plaintiff's resultant condition. Where the evidence is as consistent with the absence of negligence as it is with the existence of negligence, the case should not to go the jury. *Willis, supra; Swanson, supra.* Hence, we are not guided to any showing of error in the court's determination to remove from the consideration of the jury the issue of surgical negligence.

■ On the issue of post-operative care, whether plaintiff should have been diagnosed and treated for infection, the jury found against the plaintiff. The testimony of the doctors was to the effect that there was what they considered a best method of diagnosis and treatment that was not always possible and was not followed here, that plaintiff's symptoms could be consistent with normal reactions to injury and surgery as well as with infection, and that in their opinion there was no negligence. The court let the issue go to the jury on the basis that the jury was at liberty to accept what the doctors related, but reject the medical opinions that Dr. Barnard acted correctly. The jury obviously gave credence to the opinion testimony as well, as it was entitled to do, and found no causative negligence. Substantial and sufficient evidence supports the jury verdict on this issue.

Plaintiff argues that *Formont v. Kircher,* 91 Idaho 290, 420 P.2d 661 (1966) is controlling. We find it distinguishable on several counts. There, too, the defendant was allegedly liable for failing to properly treat infection. However, in that case the district court, sitting without a jury, made a

---

2. This standard of care will be discussed more fully below in regard to the instructions on that subject.

specific finding that the doctor had breached the requisite standard of care. As to whether the doctor's negligence had been the proximate cause of the plaintiff's injury (the plaintiff's leg had to be amputated), the testimony of experts there was to the effect that the infection was clearly present and could have been controlled. The district court there stated:

"The fact, I find, is that while infections of this sort are sometimes uncontrollable, they can ordinarily be controlled if treated properly. It is not to be expected that a person with this type of injury and infection will lose his leg."

91 Idaho at 297, 420 P.2d at 668. The district court refused to find liability only because it could not say that all the other doctors were non-negligent. This Court reversed, saying that there could be more than one proximate cause. Judgment was ordered entered for plaintiff on the ground that proximate cause could be reasonably and naturally inferred from the evidence, applying the rule as earlier stated in *Reinhold v. Spencer*, 53 Idaho 688, 26 P.2d 796 (1933). However, on the petition for rehearing the court (of different composition) split 3–2 on the issue of cause, the majority re-affirming on the basis that there was no competent evidence in defendant's favor, with the dissent stating that it was not proven the result would have been different if proper care had been given.

We think this case is far weaker than *Formont.* Here no breach of the community standard of care was found, the evidence on infection was conflicting, and there was no proof of the kind of infection, if any, and whether it could be controlled. And finally, there was present here substantial evidence of other possible causes of plaintiff's condition that were as likely or more so than was infection. In *Formont,* there were only the causal choices of infection or the original injury, the latter of which the district court had found would not ordinarily cause loss of the leg. Here the evidence adequately showed that plaintiff's condition was not unusual, given the problems existing prior to treatment. A reasonable and natural inference was not one of negligence, as in

*Formont,* but one of further deterioration of plaintiff's pre-existing condition, and the jury could so have found on the evidence before it.

## INSTRUCTIONS ON STANDARD OF CARE

█ Plaintiffs, requested two instructions were:

"No. 5: A doctor has a duty to render such professional services to his patient as are equal in care and skill as is ordinarily exercised by competent physicians and surgeons in the same locality or profession in the light of present day learning, scientific knowledge, and professional advancement in the subject.

"No. 6: You are instructed, Members of the Jury, that physicians are required to keep abreast of and use the *best modern methods* of treatment, and in so doing they may not unduly and narrowly restrict or confine their responsibility to the immediate place where they are practicing. In other words, in applying the rule that it is the duty that a physician and surgeon is required to bestow such reasonable and ordinary care, skill and diligence as physicians and surgeons in the same line of practice ordinarily have and exercise, you should not limit the learning of a physician to the city or village in which he resides, but you should require him to perform the service to his patient with the same care and skill ordinarily exercised by competent physicians and surgeons in the same specialty in light of present-day learning, scientific knowledge and professional advancement." (Emphasis added.)

His requested Instruction No. 5 in our view was adequately covered by the instructions which were given. Plaintiff urges *Flock v. J. C. Palumbo Fruit Co.,* 63 Idaho 220, 118 P.2d 707 (1941) in support of his contention that not giving his requested Instruction No. 6 was error. The defendant in that case claimed he was not required to offer the plaintiff in Payette x-ray treatment that was only available in Boise. This court said:

"The measure of responsibility for care, treatment, hospitalization, etc., resting upon . . . a physician and surgeon in the exercise generally of his profession . . . has been fixed by this court . . . as the exercise of the care and skill ordinarily exercised by competent physicians and surgeons in the same or like locality, in the light of present day learning and scientific knowledge of, and professional advancement in the subject. (Citations omitted.)

.    .    .    .    .

"The evidence showed, in keeping with approved modern methods deep therapy by X-ray or radium treatments . . . were the only effective treatments.

.    .    .    .    .

"The appellant physician and his associate frankly stated in their testimony they did not offer or suggest to respondent X-ray treatment.

.    .    .    .    .

"Physicians are required to keep abreast of and use best modern methods of treatment, and in so doing they may not unduly and narrowly restrict or confine their responsibility to the immediate place where they are practicing. We may take judicial notice that the distance between Payette and Boise is in the neighborhood of 65 miles, that the facilities at Boise are readily accessible to the respondent employe at moderate cost to him, since he availed himself of this service when it was not either suggested or furnished by appellant physician, and his expense therefor up to the trial being only $20 for hospital and $80 for the X-ray treatment.

.    .    .    .    .

"It was not a question of lack of skill, knowledge, or judgment, but a failure to give the treatment which was admittedly known, recognized, and considered to be proper . . . shown to be standard treatment and sufficiently accessible to lie within the limits of the community orbit governing the standard of treatment binding upon appellant . . ."

63 Idaho at 230–242, 118 P.2d at 711–716.

■ It is readily apparent that the *Flock* case really turns not on the best modern methods language, but on the same or like locality standard. Were plaintiff· in the instant case able to show that he was not given treatment that was readily available to him nearby, a different situation would be presented, and plaintiff would properly be heard to argue that physicians ordinarily may not ignore available advances in treatment. However, we decline to create a rule requiring the "best modern methods" in each and every case. Such would tend to result in a burden[3] approaching the insurmountable in scope, and likely indeterminable due to differing opinions within the profession. For instance, in this very case the doctors testified that what they considered to be the "best method" could sometimes be dangerous to a patient. We decline to formulate a rule of *law* which places a doctor in the position of choosing between the Scylla and Charybdis of liability for failure to use a method, on the one hand, and on the other, potential further injury to the patient if the method is used. We are not persuaded that the state of medicine is such, and the state of the law such, that the trial court erred in refusing plaintiff's requested Instruction No. 6. The instructions given properly stated the law as it now exists. A physician is not required to exercise the highest degree of skill possible. *Willis, supra; Davis v. Potter,* 51 Idaho 81, 2 P.2d 318 (1931). A physician *is* required to exercise "the care and skill ordinarily exercised by competent physicians and surgeons in the same or like locality, in the light of present day learning and scientific knowledge of, and professional advancement in the subject." *Flock, supra; Davis, supra; Swanson, supra; King-*

3. For example, such a rule would seem to require the total abandonment of x-rays in favor of CAT scanners in every case. Many areas do not have these multi-million dollar machines; yet plaintiff's argument if carried to the extreme would require as a proposition that all doctors using x-rays are negligent.

*ston v. McGrath,* 232 F.2d 495 (9th Cir. 1956). We agree that this includes the duty to make proper use of all available diagnostic aids, *Kingston, supra,* but we cannot say that this always means the "best modern methods."

## INSTRUCTIONS ON RES IPSA LOQUITUR

Plaintiff requested that the jury be instructed that it could apply the doctrine of *res ipsa loquitur* :

"No. 9: The law permits you, Ladies and Gentlemen of the Jury, under some circumstances to infer negligence on the part of a physician in cases where you, as laymen, are able to say as a matter of common knowledge and observation that the consequences of professional treatment were not such as would ordinarily have followed had the doctor exercised due care in the performance of his services, otherwise the negligence of the doctor must be proved by expert medical evidence.

"No. 10: An inference of negligence may be made by you where it can be said that in the light of past experience such an occurrence is more likely the result of negligence than some cause for which the defendant is not responsible."

The question presenting itself is whether the facts of this case are appropriate for the application of that doctrine.

This Court first discussed *res ipsa* in medical cases in *Walker v. Distler,* 78 Idaho 38, 296 P.2d 452 (1956):

"Generally speaking, negligence in malpractice cases must be established by expert medical testimony. This is so because the causative factors are not ordinarily within the knowledge or experience of laymen composing the jury.

.     .     .     .     .

"There are exceptions to the general rule which permit the plaintiff in a malpractice case to invoke the doctrine of res ipsa loquitur. Among these are cases in which the surgeon has left a foreign object, such as a sponge or surgical instru-

ment, within the body of the patient. In these cases the negligence involved is said to be within the experience and knowledge of laymen   .   .   .   .

"The doctrine has also been applied in cases where common knowledge alone may not be sufficient to enable a layman to say the accident is of a kind which ordinarily does not occur in the absence of negligence. In such cases the evidence produced is considered and, if it furnishes a sufficient basis of information from which a lay jury can reasonably conclude that the accident is of a kind which normally does not occur unless someone was negligent, the doctrine is applied."

78 Idaho at 47, 296 P.2d at 457–458 (citations omitted). However, the Court did not decide whether the plaintiffs there were entitled to the aid of the doctrine since the trial judge had granted plaintiffs a new trial and was within his discretion in doing so. Application of the doctrine it was said would turn upon the evidence to be produced at the new trial.

■ The *res ipsa* doctrine made its second appearance in medical cases in Idaho in *Hale v. Heninger,* 87 Idaho 414, 393 P.2d 718 (1964), a case markedly similar to this one, dealing with spinal surgery and the plaintiff's subsequent deteriorating condition. There this Court cited the above quoted language of *Walker* and stated the two basic elements required in order to give rise to the doctrine: 1) an agency or instrumentality under the defendant's control, and 2) circumstances such that common knowledge and experience justify the inference that the accident would not occur in the absence of negligence. The court found that plaintiff had failed to prove negligence, noting that mere suspicion was insufficient. The evidence was viewed as insufficient to require that the *res ipsa* issue be given to the jury, since the evidence showed an affliction not normally caused by negligence, and in fact of unknown origin specifically that "[o]perations on the spinal column   .   .   .   were not shown to be medical subjects within the common knowl-

edge of laymen." 87 Idaho at 423, 393 P.2d at 723. Proceeding on to the so-called "rare result" cases, the Court found *Siverson v. Weber,* 57 Cal.2d 834, 22 Cal.Rptr. 337, 372 P.2d 97 (1962), particularly persuasive, quoting the unanimous opinion in that case:

> "The fact that a particular injury suffered by a patient as the result of an operation is something that rarely occurs does not in itself prove that the injury was probably caused by the negligence of those in charge of the operation. [Citations].
>
> "To permit an inference of negligence under the doctrine of res ipsa loquitur solely because an uncommon complication develops would place too great a burden upon the medical profession and might result in an undesirable limitation on the use of operations or new procedures involving an inherent risk of injury even when due care is used. Where risks are inherent in an operation and an injury of a type which is rare does occur, the doctrine should not be applicable unless it can be said that, in the light of past experience, such an occurrence is more likely the result of negligence than some cause for which the defendant is not responsible."

87 Idaho at 424, 393 P.2d at 723. The lower court's refusal to let the jury pass on the negligence issue was upheld.

The latest pronouncement on this question appears to be *Schofield v. Idaho Falls Latter Day Saints Hospital,* 90 Idaho 186, 409 P.2d 107 (1965). Citing *Siverson* and *Walker* as well as another California case, *Engelking v. Carlson,* 13 Cal.2d 216, 88 P.2d 695 (1939), which contained a discussion of *res ipsa* cases, the conclusion was that:

> "While res ipsa loquitur may at times be applied to actions for malpractice, the doctrine must be limited to those cases where the layman is able to say as a matter of common knowledge and observation that the consequences of professional treatment were not such as ordinarily would have followed if due care had been exercised. Where such facts are absent, expert medical evidence is required to prove negligence. . . . The record in this case does not warrant application of the doctrine of res ipsa loquitur."

90 Idaho at 194, 409 P.2d at 109.

Recently the U. S. District Court for the District of Idaho dealt with the same issue in *Riedinger v. Colburn,* 361 F.Supp. 1073 (1973). That diversity case also concerned spinal surgery. The court found no direct evidence of negligence and stated that any recovery would have to be based on *res ipsa.* Citing case law from this Court, the district court stated that the doctrine *could* clearly be applied in malpractice actions in Idaho. Finding the control requirement met, the court there went on to the issue of whether an inference of negligence was justified. Noting that there were at least six possible causes for plaintiff's injury, two more likely than the others but from none of which could a layman infer negligence from his common knowledge or experience, the court held *res ipsa* inapplicable in what it considered a "rare result" case, citing *Siverson, supra,* and *Hale, supra.*

We think that those principles control this case, not requiring the giving of an instruction on *res ipsa loquitur.* As in *Riedinger,* several possible causes for plaintiff's alleged symptoms of infection were stated, only one of which actually was infection. Any inference of negligence in treatment (even if infection had been clearly shown) would not have been within the jury's common knowledge and experience. As to the surgery itself, we affirm the statement in *Hale* that spinal operations are not within the common knowledge of laymen. The testimony indicated that plaintiff's condition was a result to be expected in some (admittedly small) percentage of cases, and that there was no negligence by the doctor. Since we have said that the jury could not infer negligence from the results, plaintiff was required to prove such and this the jury found he failed to do.

## THE APPLICABILITY OF I.C. § 9–202(3)

Idaho Code § 9–202 specifies persons that may not testify. Part (3) is the

"dead man statute"; among those who may not be witnesses are:

"Parties or assignors of parties to an action or proceeding, or persons in whose behalf an action or proceeding is prosecuted against an executor or administrator, upon a claim or demand against the estate of a deceased person, as to any communication or agreement, not in writing, occurring before the death of such deceased person."

Plaintiff offered to testify that Dr. Barnard never told him of the risks of the contemplated surgery, thus attempting to raise the issue of informed consent. Defendant objected that this violated the above statute as it called for plaintiff's conclusions as to the content of conversations with the doctor.[4] The district court agreed and excluded the testimony. Plaintiff asserts that this was error and seeks to avoid the statute by arguing that he did not wish to testify as to what was said but rather as to what was not said.

Plaintiff concedes having signed appropriate consent forms (which were introduced at trial), but claims that any discussions were collateral occurrences not precluded by the statute. *Dowd v. Estate of Dowd,* 62 Idaho 157, 108 P.2d 287 (1940). We cannot agree. The consents, although general in form, were signed as presented to plaintiff after consultations with defendant. Any discussions with defendant went to the very substance of the consents, and plaintiff's offered testimony can in no way be characterized as collateral.

This being so, we hold that the district court correctly excluded the testimony in question. The statute clearly prohibits testimony by a party as to any communication not in writing with a deceased party, and this is precisely what plaintiff proposed to do. Under these circumstances, where it is clear that there were some communications, plaintiff may not avoid the statute by doing indirectly what he may not do directly. The plaintiff would be giving his interpre-

tation of conversations with the doctor; the deceased doctor's personal representative, however, would be unable to rebut plaintiff's testimony. The testimony was properly excluded. See generally 97 C.J.S. *Witnesses* §§ 215(5)(7), 216, 236 (1957); 81 Am. Jur.2d *Witnesses* §§ 344, 351, 352, 356 (1976).

Finding no error, the judgment below is affirmed. Costs to respondent.

SHEPARD, C. J., and McFADDEN, DONALDSON and BAKES, JJ., concur.

---

4. As mentioned above, Dr. Barnard died before the action was instituted; the defendant is his personal representative.