Gary R. COWMAN, Appellant,

v.

William R. HORNADAY, Jr., Appellee.

No. 67261.

Supreme Court of Iowa.

Jan. 19, 1983.

William E. Davis, Davenport, for appellant.

John A. McClintock and David L. Brown of Hansen, McClintock & Riley, Des Moines, for appellee.

Considered by REYNOLDSON, C.J., and LeGRAND, UHLENHOPP, HARRIS, and McCORMICK, JJ.

REYNOLDSON, Chief Justice.

In this medical malpractice case plaintiff Gary R. Cowman appeals from a summary judgment for defendant William R. Hornaday, Jr. We reverse and remand.

Plaintiff's petition alleged that on September 29, 1976, defendant performed a contraceptive bilateral vasectomy upon him. Further, "[t]hat previous to said surgery, the Defendant, neither personally nor through his agents, informed Plaintiff . . . of the risks involved in said surgical procedure, which were known or should have been known to the Defendant, such as the development of sperm granulomas, hematomas and testicular atrophy, and the probability of each such risk." Plaintiff alleged he thus had no knowledge upon which to form a consent and therefore did not consent or authorize the vasectomy operation. Defendant, he asserted, was guilty of assault and battery upon him and was negligent in failing to warn him of the serious nature of the operation or "that there was a possibility that the aforementioned complications could result," and "[t]hat as a result of the aforesaid, the Plaintiff . . . has sustained permanent physical impairment of testicular atrophy."

In his answer defendant admitted he was a physician and surgeon with practice limited to urology. He further admitted acceptance of plaintiff's case on September 24, 1976, agreement to perform a contraceptive bilateral vasectomy upon him, and performance of the surgery as alleged. He denied all the other allegations of plaintiff's petition.

Following discovery defendant filed motion for summary judgment, alleging Iowa law requires a plaintiff in a medical malpractice action to produce expert testimony to establish specific negligence against the defendant-physician, the action should be pleaded in negligence and not assault and battery, plaintiff was unable to secure expert medical testimony to show the defendant's negligence, and defendant's deposition testimony disclosed the incidence of atrophy of the testicle is so remote that a physician would not make such information a part of his reasonable disclosure to the patient prior to performing a bilateral vasectomy.

Plaintiff's resistance to the motion concedes he has not procured an expert witness to testify with respect to the claimed negligence, nor does he intend to.

The pleadings, depositions and interrogatory answers on file disclose that defendant asserts he told plaintiff at their first meeting about the complications of bleeding into the scrotum (scrotal hematoma), infection, sperm granuloma and several other "alleged possibil[ities]": rheumatoid arthritis, multiple sclerosis and Hodgkin's disease. Defendant was aware of the possibility of testicular atrophy, but did not inform plaintiff of that because the possibility is "extremely remote." Plaintiff denies he was informed of these possible complications.

The record before us indicates complications did result from the surgery. Following the vasectomy plaintiff developed pain in the scrotal area. He returned to defendant who diagnosed a sperm granuloma on

both sides. Medication failed to dissipate the sperm granuloma on the left side and it was surgically removed on February 21, 1977. That night he developed scrotal hematoma, resulting in a four-day hospitalization during which the scrotum was reopened, drained and packed with gauze that remained for ten days to two weeks. In about seven weeks when the drainage stopped and the wound healed, atrophy of the left testicle was evident. Plaintiff later was treated extensively by other doctors for infection of the right testicle and prostate. For purposes of the issue before us, there is no. dispute that the testicular atrophy resulted from the vasectomy. Defendant's brief describes the situation as one in which "an undisclosed complication of remote possibility occurred."

I. The principles that guide our review are well settled. A summary judgment "shall be rendered . . . if the pleadings, depositions, answers to interrogatories . . . show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Iowa R.Civ.P. 237(c). "The trial court (and this court on review) must look at the whole record in the light most favorable to the one against whom the motion is made. The moving party has the burden to show the absence of a fact issue. Even if the facts are undisputed, summary judgment is not appropriate if reasonable minds may draw different inferences from them." *Enochs v. City of Des Moines,* 314 N.W.2d 378, 379–80 (Iowa 1982) (quoting *Tasco, Inc. v. Winkel,* 281 N.W.2d 280, 282 (Iowa 1979)).

■ Another matter we have mentioned above deserves comment. Plaintiff's allegations charging assault and battery would be appropriate only in circumstances in which a doctor performs an operation to which the patient has not consented. *Perin v. Hayne,* 210 N.W.2d 609, 618 (Iowa 1973). Here there was a purported consent to the operation performed. Nonetheless, plain-

tiff's petition alleged negligence sufficiently to minimally qualify as stating a tort action under our liberal pleading procedure. Iowa R.Civ.P. 67, 69.

II. Were it not for plaintiff's concession that he did not intend to present expert medical testimony to establish the profession's standards (if any) on disclosure necessary to obtain informed consent in these circumstances, we would reverse on the authority of *Daboll v. Hoden,* 222 N.W.2d 727 (Iowa 1974). There the affidavit of one of the defendant doctors described the circumstances surrounding the death of plaintiff's decedent and alleged defendants exercised the degree of knowledge, skill, care and treatment ordinarily exercised by physicians and surgeons under like circumstances in the community. Plaintiff produced no countervailing medical affidavit or deposition testimony, and failed to answer an interrogatory seeking the identity of his experts. This court pointed out that issues of negligence, contributory negligence and proximate cause ordinarily cannot be disposed of by summary judgment. *Id.* at 732–33. We observed that the jury would not be obliged to accept as true the testimony of the affiant-physician, and that a summary disposition should be granted only on evidence a jury would not be at liberty to disbelieve. *Id.* at 734–35. We reversed the summary judgment for the defendants and remanded for trial. The posture of the case before us, however, requires us to resolve an issue of law: Can plaintiff survive a summary judgment motion while admitting he will produce no expert testimony at trial to establish what the profession's standards would require him to be told relating to the risks of the contemplated surgery?

■ III. Undergirding this controversy, of course, are the principles attached to the doctrine of informed consent. That doctrine is based on the patient's right to exercise control over his or her body, at least while undergoing elective surgery,[1] by

1. In *Riedinger v. Colburn,* 361 F.Supp. 1073, 1075–76 (D.Idaho 1973), the court defined "elective surgery" as one that was "not necessary as a matter of life and death, but rather is

a matter of choice to the patient depending on his or her desire to try to eliminate problems of discomfort." Of course, the surgery involved in this case was so optional that it would not

making an informed choice whether to submit to the particular therapy. *Sard v. Hardy,* 281 Md. 432, 439, 379 A.2d 1014, 1019 (1977). Courts frequently commence their analysis with Judge Cardozo's observation that "[e]very human being of adult years and sound mind has a right to determine what shall be done with his own body." *Schloendorff v. Society of N.Y. Hospital,* 211 N.Y. 125, 129, 105 N.E. 92, 93 (1914), *overruled, Bing v. Thunig,* 2 N.Y.2d 656, 163 N.Y.S.2d 3, 143 N.E.2d 3 (1957). The doctrine recognizes the probability that, unlike the physician, the patient is untrained in medicine, and therefore completely dependent on the trust and skill of the physician for the information upon which his or her decision is based. *Cobbs v. Grant,* 8 Cal.3d 229, 242, 104 Cal.Rptr. 505, 513, 502 P.2d 1, 9 (1972).

This duty to disclose has been held to include information relating to the nature of the ailment, the nature of the proposed treatment, the probability of success of the contemplated therapy and its alternatives, and the risk of unfortunate consequences associated with such treatment. *Natanson v. Kline,* 186 Kan. 393, 410, 350 P.2d 1093, 1106 (1960); *Scaria v. St. Paul Fire & Marine Insurance Co.,* 68 Wis.2d 1, 11, 227 N.W.2d 647, 653 (1975); *see Grosjean v. Spencer,* 258 Iowa 685, 693, 140 N.W.2d 139, 144 (1966).

Two different approaches have evolved for measuring the physician's duty to disclose. The first is the "professional rule," which in essence requires the patient to prove the customary disclosure practices of physicians or what a reasonable physician would disclose under the same or similar circumstances. *See, e.g., Rodriguez v. Jackson,* 118 Ariz. 13, 18, 574 P.2d 481, 486 (Ct.App.1977); *Fuller v. Starnes,* 268 Ark. 476, 479, 597 S.W.2d 88, 90 (1980); *Ziegert v. South Chicago Community Hospital,* 99 Ill.App.3d 83, 92, 54 Ill.Dec. 585, 593–94, 425 N.E.2d 450, 458–59 (1981). The second, or "patient rule," generally requires that the physician's communications to the patient be measured by the latter's need, and that

need is the information material to the decision. *See, e.g., Canterbury v. Spence,* 464 F.2d 772, 786 (D.C.Cir.), *cert. denied,* 409 U.S. 1064, 93 S.Ct. 560, 34 L.Ed.2d 518 (1972); *Cobbs v. Grant,* 8 Cal.3d at 245, 104 Cal.Rptr. at 515, 502 P.2d at 11; *Harnish v. Children's Hospital Medical Center,* 387 Mass. 152, 155, 439 N.E.2d 240, 243 (1982); *Cornfeldt v. Tongen,* 262 N.W.2d 684, 701–02 (Minn.1977); *Wilkinson v. Vesey,* 110 R.I. 606, 626–27, 295 A.2d 676, 688 (1972).

In determining materiality in this context two different tests have been articulated. The first, which mainly exists only in theory, is a "subjective" test, focusing on whether the particular patient would have considered the nondisclosed information sufficiently significant so as to affect his or her decision. *See* J. Waltz and T. Scheuneman, *Informed Consent to Therapy,* 64 Nw. U.L.Rev. 628, 639 (1970). Most jurisdictions following the patient rule, however, apply an "objective" test. Thus the *Wilkinson* court wrote:

> [A] physician is bound to disclose all the known material risks peculiar to the proposed procedure. Materiality may be said to be the significance a reasonable person, in what the physician knows or should know is his patient's position, would attach to the disclosed risk or risks in deciding whether to submit or not to submit to surgery or treatment.

110 R.I. at 627, 295 A.2d at 689; *see Harnish v. Children's Hospital Medical Center,* 387 Mass. at 155, 439 N.E.2d at 243.

The professional rule above described remains the majority rule today. The patient rule or some variant is gaining increasing support. *See* 2 F. Harper & F. James, *Law of Torts* § 17.1 n. 15, at 60–61 (Supp.1968); Note, *Informed Consent Liability,* 26 Drake L.Rev. 696, 709–11 (1977). The patient rule, however, does not require full disclosure in all circumstances. A number of exceptions and qualifications are well capsulated in *Sard,* 281 Md. at 444–45, 379 A.2d at 1022–23:

qualify even as "elective surgery" as defined by the *Riedinger* court.

[T]he physician retains a qualified privilege to withhold information on therapeutic grounds, as in those cases where a complete and candid disclosure of possible alternatives and consequences might have a detrimental effect on the physical or psychological well-being of the patient, or where the patient is incapable of giving his consent by reason of mental disability or infancy, or has specifically requested that he not be told. Likewise, the physician's duty to disclose is suspended where an emergency of such gravity and urgency exists that it is impractical to obtain the patient's consent. Finally, disclosure is not required where the risk is either known to the patient or is so obvious as to justify presumption of such knowledge, nor is the physician under a duty to discuss the relatively remote risks inherent in common procedures, when it is common knowledge that such risks inherent in the procedure are of very low incidence. Conversely, where the physician does not know of a risk and should not have been aware of it in the exercise of ordinary care, he is under no obligation to make disclosure. As in every informed consent case, the physician is free to introduce evidence of his compliance with the prevailing medical standard of care to explain his failure to disclose. But such proof is not conclusive; it is still for the jury to decide whether adherence to the professional standard should deprive a patient of his right of self-determination.

(Citations omitted.)

Ordinarily the patient-rule jurisdictions, in a trial of a case claiming inadequate disclosure of risk by the physician, charge the patient with the burden of going forward with evidence tending to establish prima facie the essential elements of the cause of action, and the burden of proof. Thus expert testimony ordinarily will be required, to identify, among other things, the risks of the therapy, the frequency of their occurrence, the consequences of leaving existing maladies untreated, the existence of emergencies, and proximate cause.[2] See, e.g., Canterbury, 464 F.2d at 791–92; Sard, 281 Md. at 448, 379 A.2d at 1024. The burden of going forward with evidence pertaining to a privilege not to disclose, however, rests on the physician, in whose hands the necessary evidence ordinarily rests. See, e.g., Canterbury, 464 F.2d at 791.

■ IV. In the case before us, defendant asserts the outcome is mandated by Grosjean v. Spencer, 258 Iowa 685, 140 N.W.2d 139 (1966). Grosjean involved a patient with a severe physical illness, and we applied the professional rule. Plaintiff's decedent was operated on at Muscatine for a "small tumor in his left colon," developed a "little infection," and following another operation at Iowa University hospital, died of peritonitis. Plaintiff produced no medical evidence that defendant doctors did not observe the usual medical practices in performing the operation or caring for plaintiff's decedent.

Plaintiff did claim, however, that a defendant doctor's assurance that the operation did not amount to much, the patient would be home for a visit over Christmas and be back to work in two or three weeks, coupled with his failure to disclose the danger of peritonitis and the possibility the patient had cancer, misled the patient into signing consent for the operation. Therefore, plaintiff alleged, the doctor was guilty of malpractice. Although this court recognized the physician's duty "to make a reasonable disclosure of the dangers within his knowledge which are incident or possible in the treatment he proposes to administer," id. at 693–94, 140 N.W.2d at 144, it noted plaintiff had presented no expert testimony touching on any failure of the defendant doctor in "advising" the patient, and affirmed a judgment entered on a directed verdict for defendants.

Grosjean illuminates beyond dispute the rationale underlying the professional standard. A complete disclosure might "alarm" the patient and constitute "bad medical practice." Id. at 694, 140 N.W.2d at 144.

---

**2.** In this case, through defendant's deposition and answers to interrogatories, plaintiff has generated sufficient factual issues to escape a summary judgment motion.

Withholding information might be in the patient's "best therapeutic interest." *Id.* at 694, 140 N.W.2d at 145.

It is apparent, of course, that the paternalistic or authoritarian rationale underlying the professional rule—that to inform the patient of the risks of the surgery or procedure would be counterproductive in the management of his or her illness or prompt the patient to forgo the therapy the physician believes the patient really needs—has no application in the circumstances before us. This plaintiff was, for the purposes of this appeal, a well and normal person requiring neither surgical intervention nor therapy. The operation contemplated by the defendant entailed, as he wrote on the surgery report at the hospital, a "vasectomy for socioeconomic reasons." It was not a corrective measure, but one designed to interfere with a normal bodily function. We find no valid reason for withholding from this plaintiff any information that would be material to the plaintiff's decision to consent to the surgery.

We hold the professional rule has no application in this case. The patient rule is better suited to control the relationship of the parties in this situation. Under the skimpy record before us on this appeal from summary judgment we cannot find that the risks encountered by this plaintiff were so remote that we can say, as a matter of law at this stage of the proceeding, defendant had no obligation to disclose them to the plaintiff. Defendant at one point in his deposition described testicular atrophy as an extremely remote risk, at another point he merely said the condition could not be anticipated "as a rule." The other post-operative complications encountered by plaintiff were not described as remote. There simply is a dispute whether those risks were disclosed.

We reverse the summary judgment entered in district court and remand for further proceedings in conformance with this opinion.

REVERSED AND REMANDED.